578 P.2d 1089

**BOISE WATER CORPORATION,**
Appellant,

v.

**IDAHO PUBLIC UTILITIES
COMMISSION, Respondent.**

**Application of BOISE WATER CORPO-
RATION FOR RATE INCREASE.**

No. 12512.

Supreme Court of Idaho.

May 11, 1978.

Kenneth G. Bergquist, Boise, Leonard A. Girard of Rives, Bonyhadi, Drummond & Smith, Portland, Ore., for appellant.

M. W. Richards, Jr., Asst. Atty. Gen., Wayne L. Kidwell, Atty. Gen., Boise, for respondent.

SHEPARD, Chief Justice.

This is an appeal from orders of the Idaho Public Utilities Commission denying in part Boise Water's petitions for rate increases. We set aside the orders of the Public Utilities Commission.

Two general issues are raised on this appeal. First, did the Commission err in disallowing certain operating expenses of Boise Water which had the effect of reducing the rate structure, which in turn reduces Boise Water's revenue? Secondly, did the Commission improperly treat a transfer of real property from Boise Water to one of its corporate affiliates as creating hypothetical revenue for the benefit of the ratepayers and thereby reduce Boise Water's need for actual revenue?

Boise Water is a subsidiary of General Waterworks Corporation. General owns some 65 other utilities as well as a corporation which provides management and other services to Boise Water and the other subsidiaries. General Waterworks in turn is a wholly owned subsidiary of I.U. North American Corporation, which is wholly owned by I.U. International Corporation. Boise Water's corporate decisions and activities are controlled by this holding company superstructure. Boise Water is billed for services provided to it through this holding company network. In a related case, *Boise Water Corp. v. Idaho Public Utilities Commission*, 97 Idaho 832, 555 P.2d 163 (1976) (Boise Water I), we held that as to operating expenses of Boise Water which are passed onto it by its corporate affiliates, Boise Water bears the burden of proving that those expenses are reasonable. In the instant case the Public Utilities Commission held that Boise Water had not carried its burden of proof.

The Commission requested Boise Water to submit detailed accounts of the work which had been done by the affiliates and billed to Boise Water. Boise Water claimed it was unable to provide that information since that information is in the control of Boise Water's holding companies. Those corporations were not before the Commission and they did not voluntarily submit the information sought by the Commission. The holding companies did make their out-of-state records available for inspection by the Commission staff, and in fact, the Commission staff did examine some raw records, but the Commission was not satisfied that Boise Water had shown the questioned expenses to be reasonable. Thus, discharge of the Commission's function in this matter was hampered and complicated by the utility's refusal or inability to provide detailed cost justification for those services it purchased from its affiliates.

The utility sought to justify its rate increase request by comparing its overall operating costs in two categories with the overall operating costs of roughly similar water utilities which were both affiliated and unaffiliated with General Waterworks. Those figures show that Boise Water's operating expenses in both categories were lower than those of most other utilities. The Commission chose not to rely on those comparables. As is shown by the record, certain costs incurred by General Waterworks, I.U. North American and I.U. International are allocated pro rata among the various subsidiaries. Those costs were not itemized.

The Commission did not reject Boise Water's rate increase application as alto-

gether unjustified, but instead decided to consider as reasonable an increase in Boise Water's operating expenses which corresponded to the increase in the Consumer Price Index (CPI) between 1969 and 1975— 1969 was the last year in which Boise Water had been granted a rate increase and the latter year was the test period. To the extent that Boise Water's operating costs billed by its affiliates increased more rapidly and in excess of the CPI rate, they were disallowed for ratemaking purposes.

■ In *Boise Water I* we held that the Commission could rely on the CPI as a guide to what operating expenses incurred in transactions with affiliates could be allowed when, as here, the Commission had been denied access to more reliable data by the applicant or its affiliates. However, we also held that before the CPI could be relied upon by the Commission, findings were necessary to establish a rational connection between the CPI and the appellant's operating expenses. The findings we found absent in *Boise Water I* are present in the instant case. The Commission found that "One of the principal components of the expenses for administrative and accounting services which GWM&S [a management services subsidiary of General Waterworks] and GWC charged to Applicants are salaries and wages." Clk. Tr. at 61, IPUC Order No. 12874 at 20. The Commission also found, "That the Consumer Price Index is the best available measure for the use at hand, primarily because there is a relationship between the Consumer Price Index and the cost of salaries and wages." Given those findings, we cannot say that the Commission acted arbitrarily in disallowing as excessive those affiliate charges to Boise Water which increased more rapidly than the CPI.

Boise Water next contends that the Commission misapplied the CPI to disallow expenses incurred by Boise Water in transactions with *nonaffiliates.* As we stated in *Boise Water I,* once the utility proves it incurred certain expenses in transactions with nonaffiliates "the burden then shifts to the Commission to show by substantial, competent evidence that the expenditures were unreasonable by reason of inefficiency

or bad faith." 97 Idaho at 838, 555 P.2d at 169. Boise Water contends that the Commission used the CPI as an across-the-board method for disallowing operating expense increases, irrespective of whether those expenses were incurred in transactions with affiliates or nonaffiliates.

■ The appellant's increase in administrative and general costs between 1969 and 1975 was $5.60 per customer which is 68 percent more than it had been in 1969 when Boise Water was last granted a rate increase. Of the $5.60 cost increase, certain items were not included in that account in 1969, such as transportation, franchise expenses, rate case expenses, insurance costs, employee benefit increases, construction requirements and regulatory commission increases, which total $2.67 per customer. Such costs were billed to Boise Water by *nonaffiliates.* Therefore, subtracting $2.67 from the $5.60 results in an increase of billings from *affiliates* of $2.93 or 35.6 percent, which is well within the CPI increase of 46.8 percent. The Commission erred in disallowing that portion of the increased costs which was billed by affiliates and within the CPI limits. As above stated, in transactions with nonaffiliates the Commission may not disallow expenses actually incurred unless those expenses were incurred without justification and the Commission bears the burden of showing that the expenses were incurred unreasonably. Insofar as the record presented here is concerned the Commission did not carry that burden. Hence, we hold that the Commission erred in disallowing that portion of the rate increase request based on Boise Water's increase in administrative and general costs.

■ Boise Water next asserts that the Commission erred in twice disallowing certain customer accounting expense increases in excess of the CPI. According to the Commission, those costs increased by 112 percent, or $3.92 per customer between 1969 and 1975. The gross expenditure in this account as originally submitted by Boise Water was $204,045.00. Of that amount, the Commission and Boise Water later

agreed that $18,229.00 in bad debts should be deducted. However, when the Commission made its CPI adjustment, it did not first deduct that amount but computed a CPI disallowance on the original amount of $204,045.00. It is enough to note at this time that the Commission should have deducted the amount of $18,229.00 before computing the CPI disallowance since failure to do so artificially and improperly inflates the amount to be disallowed.

▮ Boise Water also contends that part of the increase in customer accounting cost disallowed by the Commission were attributable to a 43.7 percent postal increase between 1969 and 1975. That cost increase was improperly adjusted as an *affiliate* billed expense and disallowed to the extent that it exceeded the CPI. In so doing the Commission erred. Boise Water also contends, and we agree, that the Commission likewise erred in disallowing a portion of the customer accounting cost increase which resulted from a change from mechanical to a computerized billing system. The computerized billing service was performed by a nonaffiliate. Again, the Commission erroneously disallowed a portion of that expense by treating it as an *affiliate* billing and contrasting it with the CPI.

We next turn to the second major division of this appeal which considers Boise Water's contention that the Commission erred in treating a conveyance of real property from Boise Water to one of its affiliates as creating hypothetical revenue. Since the 1880's Boise Water or its predecessors has owned real property northeast of Boise in Ada County, known as Hull's Gulch or Thunder Hills. That property was included in Boise Water's rate base at its original cost of $12,295.00. Boise Water concluded, and the Commission did not disagree, that the property rights conveyed by Boise Water were no longer used or useful in the provision of services to the customers of Boise Water. The Commission also has not contended that the property was retained in the rate base longer than it should have been. Over the years prior to the transfer, the customers of Boise Water had paid a rate of return on this land *at its original cost*, plus taxes thereon.

Boise Water transferred the property at its book value, $12,295.00. According to the evidence before the Commission, the property has development potential and its market value was in the neighborhood of $850,000–$1,020,000. Therefore, the Commission treated the transfer as though Boise Water had sold the property in an arms-length transaction to persons other than its affiliate, and that Boise Water had realized substantial revenue on the transaction.

In the world of utility law there are two methods of treating revenue. Some revenue benefits utility customers by decreasing the amount charged for rates. Other revenue benefits the shareholders of the utility. Which class of persons receives the benefit of such revenue depends on who has borne the financial burdens and risks of that property. On property other than real property, the utility receives a depreciation allowance which effects its rate of return. The depreciation is an amortized amount allowed to the utility for the consumptive utilization of its property. Theoretically, at the end of the depreciation period the property is useless or consumed and the utility has been paid back its cost of acquiring that property for the benefit of its customers. Again, theoretically, the utility can then turn around with the money received as a depreciation allowance and buy a new piece of equipment to perform the function of that property which has been consumed or become useless. One way of looking at a depreciation allowance on a utility's personal property is that the public buys that property from the utility as it is used up. In one sense, therefore, the public owns depreciable property and when a utility sells depreciable property, the ratepayers are entitled to have that sale treated as if it were the sale of the ratepayers property. The revenue ought to be included in the utility's revenue receipts which reduce the rate charges to customers.

▮ Normally, and as is the case here, real property is neither consumed nor is it made useless in consequence of its employment in utility service. Utilities do not, therefore, as a general rule, receive a depre-

ciation allowance on real property. Boise Water did not not receive a depreciation allowance on the real property in consideration here. Since ratepayers do not pay depreciation on real property used by the utility in providing service, the customers are not treated as equitable owners of that property. And not having paid the cost of purchasing nondepreciable property, ratepayers are not entitled to reap the rewards or losses on its sale or other transfer. *City of Lexington v. Lexington Water Co.*, 459 S.W.2d 778 (Ky.1970).

The Commission arrives at a different conclusion, however, by heavy reliance on a unique case from the District of Columbia. *Democratic Central Comm. v. Washington Metropolitan Area Transp. Comm'n*, 158 U.S.App.D.C. 107, 485 F.2d 786 (1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). In that case the Washington Metropolitan Area Transportation Commission was directed to give the ratepayers the benefit of an appreciation in value of land transferred from operating to nonoperating status. In that case the ratepayers were providing the capital by which the utility financed the acquisition of real property and other capital expenditures. In view of the fact that the utility's customers were providing the capital, in contrast to the usual situation where the capital is provided by the utility shareholders, that court applied a rule which it styled the "benefit follows the burden." 485 F.2d at 811. We hold that the facts present in the Washington Metropolitan Area Transportation Commission case do not exist here. The record is devoid of any justification for applying the benefit of the appreciation in value of the Hull's Gulch land to ratepayers rather than to shareholders. The Commission erred in its order concluding otherwise.

The orders of the Commission are set aside.

McFADDEN, DONALDSON, BAKES and BISTLINE, JJ., concur.