AMERICAN HOECHEST CORPORATION & others *vs.*
DEPARTMENT OF PUBLIC UTILITIES & another.

Suffolk.   September 14, 1979. — January 7, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Administrative Law,* Standing, Failure to raise issue before agency.
   *Public Utilities,* Rate structure.  *Electric Company.*

Business and institutional customers of a utility company had standing to
   challenge a decision of the Department of Public Utilities permitting
   the company to implement a reduced rate for certain elderly poor cus-
   tomers, the costs of which were to be shared equally by all customer
   classes.  [410-411]
It was within the discretion of the Department of Public Utilities to permit
   a utility company to implement a reduced rate for certain elderly poor
   customers.  [411-413]
It was within the discretion of the Department of Public Utilities to order
   that the costs of a utility company's plan to reduce rates for certain
   elderly poor customers be shared equally by all customer classes.
   [413-414]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on June 16, 1978.

The case was reported by *Kaplan, J.*

*Andrew J. Newman* for American Hoechest Corporation
& others.

*Donald K. Stern,* Assistant Attorney General, for the De-
partment of Public Utilities.

*Philip H. R. Cahill & William G. Hayes,* for the Massa-
chusetts Electric Company, submitted a brief.

BRAUCHER, J.   The Massachusetts Electric Company
(company), in filing new rates and charges designed to in-
crease its annual revenues, proposed a reduced rate for cer-
tain elderly poor customers.  The Department of Public
Utilities (department) authorized an increase in revenue
substantially less than requested and approved the special

rate for the elderly poor. The company had proposed that revenue lost by implementation of the reduced rate be recouped from the other residential customers. The department rejected this plan and ordered the costs of the reduced rate to be shared equally by all customer classes. The appellants, who are institutional and business customers of the company, challenge the department's order as it relates to the reduced rate for the elderly poor. We affirm the decision of the department.

To qualify for the reduced rate, a customer must be at least sixty-five years of age, the head of a household, and the recipient of supplemental security income ("SSI") from the Social Security Administration. The company estimated that about two per cent of its residential customers would qualify for the rate. Under the rate, customers would pay a lower price, as compared with the standard domestic rate, for usage between 22 and 375 kilowatt hours (kwh) a month. Usage below 22 kwh and above 375 kwh would be priced at the standard rate. The company calculated that implementation of the rate would result in a $905,300 decrease in revenues. The department estimates that recoupment of this deficiency from all customer classes would add $30.58 per year to the bill of the average industrial customer and $1.91 per year to the bill of the average commercial customer.

The company itself proposed the reduced rate but did not support it with any cost of service or other economic evidence. The company president and its rate design expert testified to the company's concern for elderly customers on fixed incomes, whom they referred to as the "neediest of the needy." The company also justified the proposal on the grounds that it would improve the company's image, that there was a national tendency toward some form of subsidized rates, and that a customer survey had shown a willingness among customers to help the elderly poor. Interveners before the department agreed that little is known about the spending patterns of elderly SSI recipients. Some supporting evidence was presented showing a direct rela-

tionship between income and usage, but the evidence did not provide a firm cost based rationale for the rate. One witness stated that the best method of estimating its revenue impact would be to put the rate into effect and observe the results.

The department in its opinion expressed serious reservations with social rate-making in general. The department set forth two principles for rate structures: rates should be cost based, and they should encourage conservation and the efficient use of electricity. Rate structure designs which depart from these two principles in search of social objectives risk undesirable consequences, the department stated. It noted that subsidization of one group by another renders high utility bills all the more onerous and that discount rates are likely to be counter to conservation and efficiency goals. But the department found certain reasons favoring the rate: its benefits will accrue solely to a stable group of customers needy by any standard, and, since there will be few participants, costs will be minimal. "On balance," the department concluded, "it seems reasonable to approve the rate as an experiment in alternative rate design."

The department rejected the company's proposal that residential customers, not eligible for the rate, should pay the cost of it, noting that such residential ratepayers stand in the same position as commercial and industrial customers. Finding the analogy to the financing of government social welfare programs particularly apt, the department ordered that the costs of the rate be shared equally by all customer classes. The department ordered the company to make bimonthly reports on the revenue effect of the rate.

1. It has been argued that the appellants are without standing to appeal the department's order in so far as it approves the reduced rate. Under G. L. c. 25, § 5, standing is limited to an "aggrieved party in interest." It is clear that the appellants, as interveners, are parties. *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 673-674 (1975). G. L. c. 30A, § 1 (3). It is less certain that the appellants are "aggrieved" by the department's approval of the rate as opposed to the decision that they should bear its

costs along with all other customers. The Attorney General and the company argue that any undue discrimination arises between standard domestic customers and those eligible for the rate, not between the appellants (industrial and institutional customers) and those eligible for the rate. But we note that the word "aggrieved" is given a "comprehensive meaning" in the context of appeal from an administrative action. *Dodge* v. *Prudential Ins. Co.*, 343 Mass. 375, 381 (1961). Because the appellants will bear, in part, the economic burden created by the discount rate, we hold that they have standing to challenge it. See *Town Taxi Inc.* v. *Police Comm'r of Boston*, 377 Mass. 576, 581 (1979).

2. The situation is not one where the department, on its own initiative, mandated adoption of the reduced rate and imposed it on an unwilling company. Cf. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271 (1973) (public utilities commission had no power to invade management's province by compelling reduced rate for senior citizens). Rather, in accord with our regulatory scheme, the reduced rate was initially devised by the company. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 83 (1976). "Within a substantial range the question what rates to charge is a matter for the Company's determination." *Id.* at 84. See also *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 578 (1978). There can be no question that the department's jurisdiction over the entire rate structure includes the authority to approve a reduced rate for certain customers. *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 47, appeal dismissed, 439 U.S. 921 (1978). The question is whether the rate is unduly or irrationally discriminatory. See generally J. Bonbright, Principles of Public Utility Rates 369-385 (1961).

3. It is "axiomatic in ratemaking" that "different treatment for different classes of customers, reasonably classified, is not unlawful discrimination." *Boston Real Estate Bd.* v. *Department of Pub. Utils.*, 334 Mass. 447, 495 (1956). While cost of service is a well-recognized basis for

utility rate structures, it need not be the sole criterion. *Monsanto Co.* v. *Department of Pub. Utils.*, *ante* 317, 320 (1979), and cases cited. See Jones, Judicial Determination of Public Utility Rates: A Critique, 54 B.U.L. Rev. 873, 890-892 (1974). Any number of factors may justify a separate classification. *Boston Real Estate Bd.* v. *Department of Pub. Utils.*, *supra* at 495 (particular customer may be placed in separate class because of some or all such factors as size, location or nature of business). "*The nature of the use and the benefit obtained from it*, the number of persons who want it for such a use, and the effect of a certain method of determining prices upon the revenues to be obtained by the city, and upon the interests of property holders, are all to be considered" (emphasis supplied). *Brand* v. *Water Comm'rs of Billerica*, 242 Mass. 223, 227 (1922). See *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. 538, 562-563 (1965) (not only benefit received but also population, extent, and ability to bear the burden are valid criteria for apportioning taxation among municipalities). It was not irrational discrimination to exempt the first 384 kwh of monthly residential electricity usage from a rate increase on the ground that this segment of residential usage had not contributed significantly to the growth in peak-load demand. *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 46-48, appeal dismissed, 439 U.S. 921 (1978). And we have suggested that a discount taxicab fare for elderly and handicapped persons is not invalidly discriminatory. *Town Taxi Inc.* v. *Police Comm'r of Boston*, 377 Mass. 576, 581-582 (1979).

The department approved the reduced rate as "an experiment in alternative rate-design." It may turn out that there are economic factors justifying the reduced rate. See Taubman & Frieden, Electricity Rate Structures: History and Implications for the Poor, 10 Clearinghouse Rev. 431, 434-435 (1976). Until the rate is implemented, and the reports ordered by the department and other data are analyzed, such evidence will remain inconclusive. The number of

customers covered and the average cost of the revenue deficiency as borne by each customer is very small indeed. Where, as here, the reduced rate is afforded only to the neediest of the needy, it is approved as an experiment and a limit is placed on the costs involved, we cannot hold that it was improper for the department to consider the age and income of the members of the class and the importance of the service to them. See *Application of Arkansas Louisiana Gas Co.*, 558 P.2d 376 (Okla. 1976) (within department's discretion to protect residential customers from rate increase and channel dwindling resource to human needs); *Apartment House Council of Metropolitan Washington, Inc. v. Public Serv. Comm'n,* 332 A.2d 53 (D.C. 1975) (commission considered its obligation to aid in energy crisis and recommended that revenue burden be shifted from essential [residential] users to high usage [industrial and commercial] classes). "The controlling consideration of the public interest in the exercise of the department's statutory regulating power" must encompass at least the approval of this rate. See *Boston Real Estate Bd. v. Department of Pub. Utils.,* 334 Mass. 477, 495 (1956). Cf. *New England Tel. & Tel. Co. v. Department of Pub. Utils.,* 371 Mass. 67, 85 (1976) (ten cent initial fee for coin operated telephone based on "important social value").

4. As to the department's ordering that all classes of customers share equally the cost of making the reduced rate available, we repeat again the principle that when alternative methods are available, the department is free to select or reject a particular method as long as its choice does not have a confiscatory effect or is not otherwise illegal. *Massachusetts Elec. Co. v. Department of Pub. Utils.,* 376 Mass. 294, 302 (1978). A utility is entitled to include reasonable charitable contributions in the calculation of its revenue requirement, which is supplied by all its customers. *New England Tel. & Tel. Co. v. Department of Pub. Utils.,* 360 Mass. 443, 489 (1971). The department reasoned that all customer classes stood in the same position with respect to the benefits, whatever they may be, of the reduced rate.

It was not compelled in this case to impose the cost of the reduced rate only on residential customers.

5. The appellants argue that G. L. c. 30, § 61, required the department to make a "finding describing the environmental impact, if any," of the reduced rate and that the department's order as it relates to the reduced rate must be overruled for failure to make such a finding. Such contentions should have been presented in the first instance to the department in the course of its ratemaking proceedings. See G. L. c. 30, § 62H; *Nelson* v. *Blue Shield of Mass., Inc.,* 377 Mass. 746, 752 (1979).

The case is remanded to the Supreme Judicial Court for the county of Suffolk for the entry of a judgment affirming the order of the department.

*So ordered.*