**MAINE WATER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Argued June 22, 1984.

Decided Oct. 2, 1984.

Drummond, Woodsum, Plimpton & MacMahon, P.A. by Thomas H. Allen (orally), Mary Esposito Kane, Portland, for Maine Water Co.

Roger A. Putnam, Portland; Morgan, Lewis & Bockius, Thomas P. Gadsden, Alan L. Reed, Philadelphia, Pa., for amicus curiae, Natural Assoc. of Water Companies.

William E. Furber (orally), Joseph G. Donahue, Beth A. Nagusky, Peter G. Ballou, Augusta, for Public Utilities Com'n.

Murray, Plumb & Murray by Peter L. Murray (orally) David E. Currier, Portland, for Town of Wiscasset.

Jonathan (. Hull (orally), Damariscotta, for Towns of Newcastle and Damariscotta.

Before M.KUSICK, C.J., and NICHOLS, ROBERTS WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

On April 22, 1983, Maine Water Company, pursuant to 35 M.R.S.A. § 64 (1978), filed requests with the Public Utilities Commission to increase rates in its five separate divisions serving the communities of Wiscasset, Damariscotta-Newcastle, Freeport, Kezar Falls, and Oakland.[1] The requested rate increases varied from 10.4% in Damariscotta-Newcastle to 33.0% in Wiscasset. In its January 23, 1984, decision in the consolidated cases, the Commission denied the Company any overall rate increase, solely for the reason of the gain

---

1. Maine Water Company also sought a 5.8% increase for its Wilton division, but that rate proceeding (PUC Docket No. 83–106) was dismissed when, later in 1983, the Company sold that division to a newly created water district. The five other proceedings, identified as PUC Docket Nos. 83–105 and 83–107 through 110, were consolidated for hearings before the Commission.

realized by the Company on the earlier sales in 1980 and 1983 of its Newport and Wilton divisions; but the Commission did authorize the Company to reallocate its total revenue requirement among its five divisions. After granting a motion to reopen, the Commission, on March 23, 1984, again denied any rate increase for the same reason. The Company sought timely review of the March 23 order by filing both an appeal pursuant to 35 M.R.S.A. § 303 (1978) and a complaint under 35 M.R.S.A. § 305 (1978). The Town of Wiscasset and the Towns of Damariscotta and Newcastle, intervenors before the Commission, filed section 303 cross-appeals.

By revised tariffs filed on March 27, 1984, the Company sought to make the rates of each of its five divisions correspond to that division's cost of service as found by the Commission, resulting in increased rates in Wiscasset and in generally reduced rates in the other four divisions. By supplemental order dated May 11, 1984, the Commission disapproved any rate increase in Wiscasset because it believed the Wiscasset water was of such poor quality that it was worth no more than the existing rates; but the Commission at the same time authorized the Company to recover the revenues lost in Wiscasset from its other four divisions. The Company filed a section 305 complaint seeking review of the May 11 order. Thereafter, to comply with the May 11 order, the Company filed a further revised set of tariffs, which the Commission approved by its order of May 30, 1984. From that last order the Company filed a section 303 appeal and intervenors filed cross-appeals. Subsequently, by order of this court, all of the appeals, complaints, and cross-appeals were consolidated.

We hold that the Commission erred in applying the gain on the Newport and Wilton sales to offset the rate increases that it otherwise would have allowed for the future in the remaining five divisions of the Company. We also hold that the Commission erred in shifting part of the cost of service in the Wiscasset division to the ratepayers in Damariscotta-Newcastle, Freeport, Kezar Falls, and Oakland. Finally, we deny all of the cross-appeals.

## I. *Revenue Requirements*

### A. *Sale of the Newport and Wilton divisions*

Maine Water Company is the corporate product of the consolidation in the early 1970s of seven separate water companies, serving seven separate Maine communities: Newport, Wilton, Wiscasset, Damariscotta-Newcastle, Freeport, Kezar Falls, and Oakland. Since its creation by consolidation, Maine Water Company has operated in seven (and more recently six and then five) separate divisions corresponding to the previously separate companies. Each division constitutes a complete and geographically independent water system, serving its own distinct group of customers. The divisions do not have any common source of water supply or any other physical interconnection of any sort.

Even though the Company is incorporated as a single legal entity, for all significant ratemaking purposes each division and its ratepayers are treated separate and apart from the other divisions and their ratepayers. The customers in each division pay rates determined by that division's particular cost of service. When Maine Water initiated the instant rate case, it filed with the Commission a separate rate request for each division and the Commission gave each divisional proceeding its own separate docket number. The percentage increase in rates sought by the Company varied considerably from division to division. For each division the Commission undertook to establish—and did establish—separate revenue, rate base, and expense data. Although the Commission determined the Company's overall revenue requirement, that figure was arrived at merely by aggregating the cost of service previously determined individually for the five separate divisions. We understand that this practice of individually determining the rates in each division has been consistently fol-

lowed in the past. Historically, as the Commission found, "[r]atepayers are ... charged according to tariffs which reflect the costs attributable to each division."

In 1980 the Company sold its Newport division, and in 1983 its Wilton division, to water districts created to take over and continue water service to the customers in the operating territories of those two divisions. Those sales resulted in completely transferring both the assets and the customers of those divisions to the newly formed Newport and Wilton Water Districts. The Company realized an aggregate pre-tax gain from the two sales of $1,012,473, the amount by which the sales proceeds exceeded the net book cost of the transferred assets.

Notwithstanding the divisional organization of Maine Water Company, the Commission in the case at bar treated the gain on the sale of the Newport and Wilton divisions as available to offset in part the future water rates that otherwise would be charged customers in the remaining five divisions. Although it did not order a rate reduction for the remaining customers, the Commission did use the Newport/Wilton gain as the reason, and the only reason, for denying rate increases that the Commission's own analysis of cost of service in the remaining divisions demonstrated were otherwise necessary. In effect, the Commission "flowed through," *see New England Telephone & Telegraph Co. v. Public Utilities Commission*, 470 A.2d 772, 776 n. 6 (Me.1984), a portion of the Newport/Wilton gain to the benefit of the ratepayers in the Company's five other divisions.[2] In explaining its flow-through decision in its opinion of January 27, 1984, the Commission downplayed the significance of the di-

visional aspect of the Company. Of first importance to the Commission was its view that since Maine Water Company is a single company, the ratepayers of all divisions should be responsible for its financial well-being. The Commission made the Company's aggregate revenue requirement the focus of these rate proceedings, and the Commission characterized the allocation of rate base and expenses among the divisions as one of merely "rate design." The Commission found it "inescapable" that "[a]s a matter of law ... the risk of loss and the financial burden of any one division are borne by the ratepayers of all divisions." The Commission set up a hypothetical construct by which if the Newport and Wilton sales had produced a loss to the Company, the ratepayers still served by the Company in different divisions would be required to make up that *loss* through increased rates in the future. Therefore, the Commission reasoned, those same ratepayers should receive the benefit of any *gain* on the sale of the separate divisions.

■ We conclude that in the special circumstances here presented, that ruling of the Commission cannot survive appellate review. Initially we note that the properties that Maine Water Company has devoted to a public utility service are privately owned by the Company, not by its customers. *See Board of Public Utility Commissioners v. New York Telephone Co.*, 271 U.S. 23, 31–32, 46 S.Ct. 363, 366, 70 L.Ed. 808 (1926). "Customers pay for service, not for the property used to render it." *Id.* at 32, 46 S.Ct. at 366. In *New York Telephone*, the United States Supreme Court went on to say:

---

2. The Commission flowed through only 90% of the Newport/Wilton gain, leaving the Company 10% of the gain "in order not to discourage the Company from selling its divisions to water districts." Because of uncertainty whether the Newport/Wilton gain would be accorded capital gains tax treatment, the Commission treated the gain as ordinary income for purposes of computing the flow-through. Further, the Commission found that the Company had failed to

show what part, if any, of the Newport and Wilton assets were nondepreciable, and held that "[t]his failure of proof along is not grounds for a rate decrease in this case." On their cross-appeals, the Towns contend that the Commission erred in all of these rulings. In view of our reversal of the Commission's decision on the Newport/Wilton issue, we do not reach these cross-appeal contentions of the Towns.

By paying bills for service [customers] do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. *Id.* From that comprehensive and unqualified statement, however, subsequent judicial authority, including our own, has carved out a well-defined exception. *See Casco Bay Lines v. Public Utilities Commission,* 390 A.2d 483 (Me.1978). The courts have come to recognize that in certain circumstances customers "by paying bills for service" do indeed acquire in the property of the privately-owned utility an equitable interest that is entitled to consideration in ratemaking. In the instant case we are called upon to examine the limits of the exception to the *New York Telephone* principle. In particular, we must address the question of *which* customers acquire for ratemaking purposes an equitable interest in *what* property of the utility company.

■ Courts have held that public utility customers have an equitable claim to draw benefit in ratemaking from the gain realized in the utility company's sale of property as to which those customers have reimbursed the company for its investment or have borne the risk of a sale at a loss. Thus, the continuing customers of a utility that sells at a gain *depreciable* property that had previously served those same customers have a right to have that gain applied to reduce their future rates. In *Casco Bay Lines v. Public Utilities Commission,* a regulated ferry company sold at a gain three of its vessels that had previously been devoted to serving its transportation customers in its single franchise area centered on Portland. The Law Court affirmed the Commission's application of that gain to reduce depreciation expense for purposes of fixing future rates to be paid by the same body of continuing customers. *See* 390 A.2d at 489–90. We found that the gain realized on selling the three ferry boats reflected excessive depreciation payments, which it was "entirely reasonable to

redistribute . . . to the ratepayers by means of future reductions in Casco's depreciation expense." *Id.* at 489. We also noted "that when a utility sells [depreciable][3] property at a *loss* it is generally allowed to amortize such loss as an expense to be recovered from its ratepayers." *Id.* at 490 (emphasis in original). We concluded:

It is only equitable that the ratepayers who bear the cost of depreciation and maintenance on the property and the burden of a sale at a loss, should be entitled to benefits from the sale of such property at a gain.

*Id.* Accord In re Revision of Rates Filed by Plainfield-Union Water Co., 57 N.J.Super. 158, 176–77, 154 A.2d 201, 211 (1959).

In contrast to *Casco Bay Lines* stands the line of court decisions involving the sale by a utility company of property as to which the continuing body of customers has *not* reimbursed the company for the acquisition cost or borne any risk of sale at a loss. On those facts, no reason exists for departing from the *New York Telephone* principle, and with near unanimity the courts find that the continuing customers have no equitable claim upon the gain from sale of such assets. The typical case involves the sale of land, that is, nondepreciable property, as to which the customers through their rates have not reimbursed the company for its investment therein. *See Pennsylvania Gas & Water Co. v. Public Utility Commission,* 72 Pa. Cmwlth. 331, 456 A.2d 1126, 1137–38 (1983) ("the shareholders contributed the capital from which the land was purchased and bore the risk of any decline in the value of the land"); *Washington Public Interest Organization v. Public Service Commission,* 446 A.2d 28 (D.C.App.1982); *Boise Water Corp. v. Public Utilities Commission,* 99 Idaho 158, 161–62, 578 P.2d 1089, 1092–93 (1978); *City of Lexington v. Lexington Water Co.,* 458 S.W.2d 778 (Ky. App.1970). The Commission's heavy—and almost exclusive—reliance upon the out-of-

**3.** The authority that the *Casco Bay Lines* opinion cited for the quoted proposition discussed the

treatment of loss and gain on sale of *depreciable* property.

the-ordinary case of *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 485 F.2d 786 (D.C.Cir.1973), is misplaced in the context of the case at bar. As the Pennsylvania appellate court, in rejecting *Democratic Central Committee* as precedent for awarding gain from sale of land to ratepayers, has said of the distinguishing features of that case:

[T]he transit utility acquired a transit system pursuant to an act of Congress at a cost $10 million less than the original cost. In addition, rate-payers paid for the acquisition of capital assets, a function usually performed by shareholders. Absent any regulatory accounting rule, at the time of the sale, the D.C. Court was forced to rely upon equity to prevent the shareholders from realizing an unwarranted windfall.

*Philadelphia Suburban Water Co. v. Public Utility Commission*, 58 Pa.Cmwlth. 272, 427 A.2d 1244, 1247 (1981); *see also Boise Water Corp.*, 99 Idaho at 162, 578 P.2d at 1093 (*Democratic Central Committee* is "a unique case").

When we apply the principles of the foregoing court cases to the facts of the present appeal, we conclude that the ratepayers of Wiscasset, Damariscotta-Newcastle, Freeport, Kezar Falls, and Oakland have no rationally supportable claim to any flow-through of the benefit of the gain the Company realized in selling its Newport and Wilton properties. On the precedent of *Casco Bay Lines*, the ratepayers in the communities of Newport and Wilton might have some *prima facie* claim to the gain to the extent the properties in each of those divisions were depreciable. At least as to those depreciable assets the Newport/Wilton ratepayers bore the cost of depreciation and maintenance, as well as the risk that individual assets might be sold to a third party at a loss. Those ratepayers, however, through their newly organized public water districts bargained, presumably at arms length, to pay the appreciated prices for the assets. There undoubtedly existed a number of practical reasons why the water districts were willing to pay more than net book cost for the Newport and Wilton divisions of Maine Water Company. *Cf. Kittery Electric Light Co. v. Assessors of the Town of Kittery*, 219 A.2d 728, 735–37 (Me.1966) (tax valuation not limited to net book cost). Even if there were some way of "flowing through" the Company's gain on the Newport/Wilton sales to the Newport/Wilton ratepayers—as there is not—neither they nor any persons representing them are suggesting that they have preserved any right to benefit from that gain in a transaction in which they were in effect on the other side from the Company.

The ratepayers in the five remaining divisions do not stand vis-a-vis the Newport/Wilton gain in any position at all comparable to that of Casco Bay Lines' ratepayers vis-a-vis that company's gain on the sale of three ferry boats. Maine Water's present customers have never paid any rates that have reflected any depreciation expense on the water systems in Newport and Wilton. Over the years the rates of each of those transferred divisions have been separately set to cover its individual cost of service, including the particular depreciation expense associated with its particular assets.

Furthermore, Maine Water's present remaining ratepayers never have borne any risk of loss on the Newport and Wilton properties. We can give little or no weight to the Commission's hypothetical, "bootstrapping" declaration that it would have imposed a Newport/Wilton loss upon the ratepayers of the other divisions. To back up that declaration, the Commission sets forth no reasoning, and cites no authority, independent of the reasoning and authority it uses to support its decision to "flow through" the gain. Such a "cross-subsidization" runs counter to the separate treatment historically given the Maine Water divisions for ratemaking purposes and is antagonistic to a basic goal of ratemaking to "protect one class of customers from paying the costs attributable to another class." *El Paso Electric Co. v. Federal*

*Energy Regulatory Commission,* 667 F.2d 462, 468 (5th Cir.1982) ("stand-alone" principle used in fixing rates of customers under different state and federal jurisdictions).[4] We, however, need not decide the abstract question whether the Company could recoup a *loss* incurred on the Newport and Wilton assets through higher rates charged customers in the other five divisions. That eventuality at all times was and still is too remote, for both practical and legal reasons, to provide any justification for the Commission's giving the benefit of the Newport/Wilton *gain* to those other customers. In sum, as to any of the Newport and Wilton properties, whether depreciable or nondepreciable, the reasons that led this court to approve flow-through to the customers of Casco Bay Lines of gain realized from sale of three boats serving those same customers are totally absent.

■ Our conclusion is supported by the only case authority of which we are aware that is factually on all fours with the case at bar. A decision last year of the Missouri Public Service Commission[5] involved exactly the same factual pattern as we have here: sale by a gas utility of one of its geographically distinct and unintegrated operating divisions, with the concomitant transfer of customers, to another operating utility. *See Re Associated Natural Gas Co.,* 55 P.U.R. 4th 702 (Mo.P.S.C.1983). The Missouri commission rejected a strong contention on behalf of the ratepayers of the remaining divisions of Associated Natural Gas Company that the gain from that company's sale of its entire Kennett division to the City of Kennett be applied to reduce their future rates. The *Associated*

*Natural Gas* decision followed the precedent of *Matter of Missouri Cities Water Co.,* Cases Nos. WR–83–14 and SR–83–15 (Mo.P.S.C. May 2, 1983), in which the Missouri commission considered at length and rejected the same arguments pressed now before this court. It is true that the Missouri Uniform System of Accounts provided for "below the line" treatment of gain or loss "[w]hen utility plant constituting an operating unit or system is sold, conveyed, or transferred to another [utility] by sale, merger, consolidation, or otherwise." *Id.* at 18. The Missouri commission, however, noted that it was not bound by that accounting rule in deciding the pending issue, and based its decision upon a full canvass of the relevant legal arguments and policy considerations, as well as upon that rule.[6] *See id.* at 24–25. Accordingly, the Missouri cases provide worthy precedent for the case at bar.

Our Maine Commission fell into error by refusing to recognize the critical difference between 1) the sale of isolated items of property in the course of a continuing utility operation and 2) the sale of a complete, independent utility division along with a transfer of that division's customers. The first is a normal and in many cases routine feature of the operation of a utility business; the second constitutes a partial liquidation of the utility corporation. The appellees concede, as they must, that upon a complete liquidation of Maine Water Company its shareholders would suffer or acquire whatever loss or gain resulted from the liquidation. The sale of the Newport and Wilton divisions constitutes a *pro tanto* liquidation of Maine Water Company's assets and business.

---

4. In part II of this opinion we discuss the ratemaking principle by which the customers of one of the Maine Water divisions are protected from paying part of the cost of service in other divisions. See pp. 454–458 below.

5. *See generally Central Maine Power Co. v. Public Utilities Comm'n,* 455 A.2d 34, 40–41 (Me. 1983) (decisions of other jurisdictions' regulatory commissions may be persuasive precedent in Maine).

6. Accounting rules that result from policy judgments deliberately arrived at by the issuing regulatory agency are entitled to be given considerable precedential weight. *See American Tel. & Tel. Co. v. United States,* 299 U.S. 232, 236–37, 57 S.Ct. 170, 172–73, 81 L.Ed. 142 (1936); *see generally* C. Phillips, *The Economics of Regulation* 144–47 (1965).

On the basis of both reason and applicable legal authority, we reverse the Commission's ruling that the gain realized by Maine Water Company in selling its Newport and Wilton divisions must be applied to reduce the rates the Company may charge in the future in Wiscasset, Damariscotta-Newcastle, Freeport, Kezar Falls, and Oakland.

### B. *Expenses and Rate Base*

#### 1. *Management and Supervision*

The Town of Wiscasset cross-appeals from the Commission's treatment of the management and supervision expenses incurred by the Company, including those charged it by its parent, Consumers Water Company. Maine Water presented evidence of the management and supervision expenses for each of its five divisions, ranging from $43.38 per customer in Wiscasset to $17.03 per customer in Oakland, for an average of $25.76 per customer Company-wide. The Company had the burden to prove the reasonableness of its expenses, *see* 35 M.R.S.A. § 64 (Supp.1983–1984), and the Commission found that the Company had failed to satisfy that burden. The Company has not appealed that finding. In place of the Company's requested per customer expense allowance of an average of $25.76, the Commission determined a per customer management and supervision expense by examining the expenses of 43 other water utilities having between 300 and 800 customers, the range in size of the five divisions of Maine Water Company.[7] The Commission had developed this method in *Re Mechanic Falls Water Co.*, 13 P.U. R.4th 347 (Me.Pub.Util.Comm'n 1976), and on appeal this court had approved the method as a "permissible" one. *See Mechanic Falls Water Co. v. Public Utilities Commission*, 381 A.2d 1080, 1099 (Me. 1977). Since the *Mechanic Falls* method here yielded an average management and supervision expense of $19.80 per customer in those 43 water utility "comparables," the

Commission allowed Maine Water 76.9% of each division's expense, representing the ratio of $19.80/$25.76. As a consequence, the Commission allowed a reduced management and supervision expense for each division, ranging from $33.34 per customer in Wiscasset to $13.09 per customer in Oakland, for an average of $19.80 per customer Company-wide.

On our review of this expense allowance, as on the other expense and rate base issues raised on the cross-appeals, the Commission's decision is entitled to considerable deference. Absent a demonstrable error of statutory or constitutional law, we will review the Commission's orders only for an abuse of discretion. *See New England Telephone & Telegraph Co. v. Public Utilities Commission*, 448 A.2d 272, 278–79 (Me.1982). In that review, as we have recently explained,

> [t]he Commission has broad discretion in selecting among various rate-making methodologies, provided that they are reasonably accurate. [Citation omitted] The Commission is not required to manipulate its methodologies to eliminate every shred of suggested inaccuracy.

*New England Telephone & Telegraph Co. v. Public Utilities Commission*, 470 A.2d 772, 776 (Me.1984). We will uphold the action of the Commission so long as it is reasonable and supported by substantial evidence. *See Mars Hill & Blaine Water Co. v. Public Utilities Commission*, 397 A.2d 570, 575–76 (Me.1979).

Wiscasset first argues that since the burden of proof rests on the Company, the Commission cannot go outside the Company's proof and select data from other utilities to substitute for deficiencies in the Company's evidence. It is true that when a utility files a request for a rate change, "the burden of proof to show that such change is reasonable shall be upon the public utility." 35 M.R.S.A. § 69 (Pamph. 1983–1984). The statute places on the utili-

---

**7.** The five divisions have the following number of customers: Wiscasset, 332; Damariscotta-Newcastle, 516; Freeport, 593; Kezar Falls, 370; and Oakland, 779; for a total of 2,590.

ty the burden of original production, as well as of ultimate persuasion. Where, however, the Commission finds the Company's proof of the reasonableness of a particular expense inadequate, the Commission is not required to treat the matter as if the Company had no such expense at all. Much of the Commission's expertise would be wasted if it were not allowed to use information available to it, regardless of the source of that information. Utility commissions may make reasonable assumptions or use relevant outside data to fill in the holes in either party's proof in a rate proceeding. *See, e.g., Boise Water,* 99 Idaho at 160, 578 P.2d at 1091 (use of consumer price index to measure change in affiliate costs where more reliable data is lacking). In pursuit of its ultimate goal of setting just and reasonable rates, the Commission may set intracorporate expenses by reference to facts other than those brought forth by the public utility. *See Washington Water Power Co. v. Public Utilities Commission,* 105 Idaho 276, 281, 668 P.2d 1007, 1012 (1983) (court looks to facts shown in commission order, not facts proven by utility, in upholding order substituting parent's rate of return for subsidiary's reasonable expenses); *Montana-Dakota Utilities Co. v. Bollinger,* 632 P.2d 1086 (Mont.1981) (where commission invalidates parent-subsidiary expenses, commission must make its own factual findings). As with the initial proof burden on the public utility, the substitute facts used by the Commission must have a "rational connection" to the element of expense at issue. *See Boise Water,* 99 Idaho at 160, 578 P.2d at 1091.

■ Wiscasset's second argument on the management and supervision expense issue is that the data from the other utilities chosen for comparison are not rationally connected to Maine Water's expenses. Wiscasset argues that the choice of utilities having 300 to 800 customers is improper

because the five divisions of Maine Water in the aggregate serve upwards of 3,000 customers. We cannot agree. The Commission made that comparison in light of the 300 to 800 customer size of Maine Water's divisions. A comparison of Maine Water to other single-system utilities with 3,000 customers would ignore the distinctive separation of Maine Water into geographically isolated divisions. The Commission could reasonably believe that the five divisions, as separate water systems in various parts of the state substantially removed from one another, create managerial and supervisory problems not likely to be encountered by a unitary water system serving customers in a single compact area.

■ As a third point Wiscasset argues that the Commission erred in not allocating certain Company-level management and supervision expenses on a per-customer basis. The Commission found the per-division allocation system used by the Company reasonable in light of the unique problems associated with the management and supervision of a multi-divison operation. As the Commission found, "Many functions must be performed no matter how many customers a company has and are therefore dependent on the very fact that there is a company or division rather than upon the number of customers."

We find no error in the Commission's reduced allowance of management and supervision expenses in each of the Company's divisions.

### 2. *Rate case expense*

■ The Commission allowed the Company to recover from its customers in its five divisions rate case expenses incurred by the Company before the Commission in this current case in a total amount of $96,-871, to be amortized in part over two years and in part over five years.[8] Thus, the Company's total annual revenue entitlement as found by the Commission included

---

**8.** The Commission disallowed $500 of the Company's request and extended the Company's requested amortization period from two to five years on the litigated portions of the case. The Company has not appealed on this issue.

about $20,000 for rate case expense. The Commission based its allowance upon the findings that the Company did not act unreasonably in filing its rate increase request and that the rate case expense, although large, was reasonable in amount in view of the substantial number of parties involved and the myriad of issues, many complex, that were put in litigation. Contrary to the cross-appellants' contentions on appeal, we find no error in those findings.[9]

Of course, a public utility may not "force rate increases upon its customers solely as a result of expenses incurred in abortive or frivolous rate cases." *Stratton Water Co. v. Maine Public Utilities Commission*, 397 A.2d 188, 192 (Me.1979) (quoting *Re Carolina Water Company*, 32 P.U.R.3d 462, 470 (N.C.U.C.1960)). But the Commission rightly did not classify this rate case as "abortive or frivolous." The allowance for ratemaking purposes of rate case expenses depends, as does the allowability of any other operating expense, upon whether those expenses were prudently incurred. The prudence of any utility expenditure is tested in regard to both its purpose and its amount. *See generally Pennsylvania Public Utilities Commission v. Philadelphia Electric Co.*, 501 Pa. 153, 460 A.2d 734, 738 (1983) (commission should disallow only expenditures that are "imprudently made" or are "abuses of managerial discretion"). "[I]t would be proper for a public utility company to be allowed rate case expenses when 'the public service company has reasonably and fairly employed outside help in connection with ... (the) case'." *Lone Star Gas Co. v. Corporation Commission*, 648 P.2d 36,

41 (Okla.1982) (quoting *Carey v. Corporation Commission*, 168 Okla. 487, 491–92, 33 P.2d 788, 794 (1934) (ellipsis in original)); *cf. Washington Gas Light Co. v. Public Service Commission*, 450 A.2d 1187, 1240–41 (D.C.App.1982) (costs of defending breach of contract suit should be borne by ratepayers).

The Commission acted well within its discretion in finding that the Company's rate filing was not imprudent. But for the Newport/Wilton issue, the Company would have been granted a rate increase. Given the novelty and difficulty of that issue, the Company acted prudently in seeking a rate increase notwithstanding the gain it had received from the Newport and Wilton sales. We also will not interfere with the Commission's conclusion that the sum expended by the Company in prosecuting the rate case was reasonable and prudent in amount; the Commission was in a much better position than we to pass judgment on that question.

### 3. Well search expenses

The Commission allowed the Company to recover from its Wiscasset customers over a five-year period the $125,000 cost of a well search effort in that division. The Town of Wiscasset argues that a memorandum of agreement signed by the Company and the Town required the Company to bear those costs. The agreement, however, is far from clear. It can be fairly read simply to require the Company to provide the funds for the search in the first instance, without resolving whether the Company's customers or its shareholders, as against the Town, would ultimately bear the well search expense. In any event, the

---

**9.** Also, the Commission correctly rejected the Towns' contention that the Commission should abandon its traditional practice of treating rate case expense "above the line," and instead should charge one half of that expense to the utility's owners. In support of a 50–50 split of rate case expense between ratepayes and shareholders, the Towns cite a 1982 Pennsylvania commission decision, *Pennsylvania Public Utility Comm'n v. Quaker State Telephone Co.*, 48 P.U.R.4th 510, 519–20 (Pa.P.U.C.1982). Even be-

fore the Pennsylvania Commonwealth Court reversed that commission's 50–50 split of utility rate case expense in another case, *Butler Township Water Co. v. Pennsylvania Public Utility Comm'n*, 473 A.2d 219, 221–22 (Pa.Commw.Ct. 1984), the Pennsylvania commission had itself "abandoned the policy ... and in more recent cases has reverted to its immemorial practice of allowing the full amount of reasonable rate case expense as an operating expense." *Id.* at 222.

agreement does not operate to divest the Commission of its normal regulatory power to consider for ratemaking purposes costs actually incurred by a utility. By its express terms the agreement was subject to the approval of the Commission, the Maine Department of Human Services, and Wiscasset's legislative body, none of which agencies has acted to approve.

■ The Town of Wiscasset also argues that the Commission committed an abuse of discretion in allowing the Company to recover the costs of this well search before the water quality problem in Wiscasset has been solved. We reject the Town's argument because, as the Commission found, the well search was a completed and distinct phase of the broader water improvement efforts in Wiscasset.

### 4. Wiscasset treatment plant

Using a 1982 test year, the Commission adjusted the rate base of the Wiscasset division to include some additions made in 1983 to the Wiscasset treatment plant.[10] The Town argues that this inclusion in rate base was improper because, according to the testimony of a substantial number of Wiscasset residents, no observable improvement in Wiscasset water resulted from those additions. On the other hand, the Commission chose to credit objective scientific testing indicating some improvement in the water as a product of those additions.

■ Although the 1983 additions were but a part of a larger improvement planned for the treatment facility, the Commission acted within the proper scope of its discretion in finding that those additions, by themselves, were sufficiently useful and separable to warrant their recovery prior to the completion of the whole project. The Commission also was justified in finding that despite the use of those additions only during the summertime, they were nonetheless property of the "public utility used

or required to be used in its service to the public." 35 M.R.S.A. § 52 (1978).

■ Finally, there was no error in the Commission's inclusion of those additions in the 1982 test year rate base even though they were not put into service until 1983. The general rule that the test year rate base should only include property providing service during that year, see New England Telephone & Telegraph Co., 448 A.2d at 294, may be relaxed "to reflect subsequent known changes that [are] certain to alter significantly the assumed balance among revenues, expenses and plant." New England Telephone & Telegraph Co., 470 A.2d at 775. In the case at bar, the treatment plant additions did not produce additional revenue; the cost savings resulting from the 1983 additions were quantified and the test year expenses adjusted downward accordingly; and the additions, constituting about 25% of the Wiscasset division's rate base, were not a part of any routine, regularly recurring maintenance program. Thus, the Commission had sound basis for concluding that the treatment plant additions were too significant to ignore and that they could be included in the test year figures without impermissibly distorting the relationship among revenues, expenses, and rate base.

### II. Determination of Rates within the Five Divisions: Wiscasset Water Quality Issue

The record before the Commission reveals substantial problems with the quality of the public water available in Wiscasset. Although it meets all health standards prescribed by the Department of Human Services, the Wiscasset water has a bad taste, odor, and color, and the Commission found that it causes excessive deterioration of water-using appliances. Many customers have found it necessary or desirable to seek out other sources of drinking water or

---

**10.** The Commission also reduced 1982 operating expenses by the amount of cost savings produced by the 1983 treatment plant addition. Including this plant addition in rate base produced only a minimal *net* effect upon the Wiscasset division's revenue requirement.

to install their own private filters. A separate water quality proceeding brought in 1982 by a group of dissatisfied Wiscasset customers is still pending before the Commission.

Wiscasset's quality problem arises from the serious shortcomings of that division's source of supply in Ward Brook. A search for a new water supply failed to come up with an economically feasible alternative.[11] As a consequence, the efforts of the Company, as well as of the Commission, have now turned to enhanced treatment of the Ward Brook water. Finding a solution to Wiscasset's water quality problem, coming as it does from the fact there are available only limited sources of supply within a feasible distance of the village, is made still more difficult by the small number of customers (only about 330) available to bear the cost of either a new supply source or an additional treatment facility.

By its order of May 11, 1984, the Commission refused to allow any increase in the water rates of the Wiscasset division, even though by its prior determinations the cost of service (and therefore revenue requirement) within that division exceeded the revenue produced by its existing rates. As a matter of "rate design" that excess cost of service in Wiscasset should, the Commission held, be put over onto the ratepayers of the other divisions. For that shift of a burden from Wiscasset customers to those in other towns, the Commission gave as its reasons that Wiscasset customers should not be charged more for water than that water was "reasonably worth" and that in any event the Company was not being penalized because the Commission was not requiring it to reduce its rates in Damaris-

cotta-Newcastle, Freeport, Kezar Falls, and Oakland to reflect the lower cost of service there. In its final order of May 30, 1984, the Commission summarized its decision that is now here on review:

> As indicated in the May 11 Order, our decision not to increase rates in Wiscasset was intended to reflect value of service as an element of rate design. We further indicated in that Order that we would not prevent the Company from recovering the resulting revenue loss from other divisions.

As the Commission's brief before us points out, the Commission did not find that the inferior water of Wiscasset represented a default by the Company in its service obligation necessitating a reduction in Maine Water's total revenue entitlement as a penalty to the Company and its shareholders.[12] On the contrary, the Commission found that the Company's efforts to improve water quality in Wiscasset had been reasonable. The Commission used the "value of service" test in justification for its transferring part of Wiscasset's cost of service to the customers of the other communities that happen to be served by the same utility corporation. The Commission's May 11 order specifically rejected any intention of penalizing Maine Water Company for the inferior quality of Wiscasset's public water, thus emphasizing its use of the "value of service" concept solely to justify authorizing the Company to charge water rates in each of its other four divisions to produce revenues in excess of that division's cost of service.

▮▮▮▮ That decision is erroneous as a matter of law.[13] It violates the "funda-

11. See discussion of the well search expense issue in part I(B)(3) of this opinion, pp. 453–454 above.

12. This fact distinguishes the case at bar from *Gay v. Damariscotta-Newcastle Water Co.,* 131 Me. 304, 162 A. 264 (1932), and earlier cases of this court that are there cited. It also distinguishes appellate court cases that have approved rate penalties because of inadequate service. See *D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm'n,* 466 F.2d 394

(D.C.Cir.1972); *United Tel. Co. v. Mayo,* 215 So.2d 609 (Fla.1968).

13. Before this court, the Commission argues that Maine Water Company lacks standing to assert this error because the shift of part of Wiscasset's cost of service to other divisions "as a matter of rate design" still permits the Company to recover its full aggregate revenue requirements and thus it cannot show aggrievement from the Commission's allocation of the total Company revenue entitlement among its sepa-

mental objective in utility ratemaking ... that customers who benefit from a service should bear the costs of providing that service." *Alabama Gas Corp. v. Alabama Public Service Commission*, 425 So.2d 430, 438 (Ala.1982). That decision also contravenes the corollary to that fundamental objective, which calls upon the ratemaking process to avoid "cross-subsidization," to "protect one class of customers from paying the costs attributable to another class." *El Paso Electric Co. v. Federal Energy Regulatory Commission*, 667 F.2d 462, 468 (5th Cir.1982). As pointed out in *El Paso*, those basic principles date back to *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), which declared that one class of customers should be neither burdened by the losses from other service nor benefited from its profits. *See also New England Telephone & Telegraph Co.*, 470 A.2d at 782 ("it is important that ... as nearly as possible, the same ratepayers who are charged for a service will receive the benefit therefrom"); *Federal Power Commission v. United Gas Pipe Line Co.*, 386 U.S. 237, 243, 87 S.Ct. 1003, 1007, 18 L.Ed.2d 18 (1967) (commission must match taxes with customers of region bearing that tax); *City of Fort Smith v. Arkansas Public Service Commission*, 278 Ark. 521, 525, 648 S.W.2d 40, 41–42 (1983) (municipal fees and taxes imposed on a utility should be borne by customers from that municipality); *Midwest Gas Users Association v. State Corporation Commission*, 3 Kan. App.2d 376, 391, 595 P.2d 735, 746 (1979) (" 'The touchstone of public utility law is

the rule that one class of consumers shall not be burdened with costs created by another class' ").

In contrast to the complex integrated utility systems usually involved in rate cases that apply those basic principles, the fact situation is here very simple. Each of Maine Water Company's five divisions is physically and operationally independent. Each division's costs are readily identifiable, and in fact have been identified by the Commission. Thus, this court is not faced, as was, for example, the court in *El Paso*, 667 F.2d at 468, with applying a "stand-alone" principle, by which each jurisdictional class of customers is treated *as if* it were a separate utility system. Each division of Maine Water Company *is already* that separate system, and the basic ratemaking principles are immediately and directly relevant and, we believe, controlling.

Our conclusion is not changed by labelling the present question, as did the Commission, as one of rate design or structure. The result is exactly the same if one analyzes the question as one of designing such rates throughout Maine Water Company as will produce the Company's total revenue entitlement based on its total cost of service. Professor Bonbright states that, in addition to recovery of the utility's total revenue requirement, the primary objectives of a sound rate design are twofold: (1) "the fair-cost-apportionment objective, which invokes the principle that the burden of meeting total revenue requirements

---

rate divisions. Even if we consider that this issue on appeal involves only rate design, the Commission has cited to us no case that holds that a public utility has no standing on that issue. On the contrary, we have in the past entertained without question utility rate appeals on rate design. *See, e.g., New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d 272, 313–15 (Me.1982); *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 390 A.2d 8, 58–60 (Me.1978); *see also People's Counsel v. Public Serv. Comm'n*, 462 A.2d 1105, 1112–13 (D.C.App.1983). The initial choice of rate design is left to the business judgment of the public utility. *See American Hoechest Corp. v. Department of Public Util.*, 379 Mass. 408, 411, 399 N.E.2d 1, 3 (1980);

*Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302, 302 A.2d 757, 775 (1973). If the Commission committed legal error in rejecting the Company's proposed schedules of rates for its several divisions, the Company has standing to obtain redress for that illegal interference with the business judgment of the utility management. As Professor Bonbright states, "[T]he ability of a company to secure adequate over-all revenues depends on the structure of the rates as well as on their average height, as every management knows when it undertakes to improve its earnings by means of promotional rate reductions." J. Bonbright, *Principles of Public Utility Rates* 136 (1961).

must be distributed *fairly* among the beneficiaries of the service" and (2) "the optimum-use or consumer-rationing objective, under which the rates are designed to discourage the wasteful use of public utility services while promoting all use that is economically justified in view of the relationships between costs incurred and benefits received." J. Bonbright, *Principles of Public Utility Rates* 292 (1961) (emphasis in original). Since a utility's total revenue requirements are determined by its aggregate cost of service, logic suggests that in fairness the individual rate paid by one class or group of customers should be commensurate with its contribution to the utility's total costs. Cost-of-service pricing also comports with Bonbright's "consumer-rationing" objective. *Id.* at 295.

It is true that "value of service" has played some part in fixing rates in some types of regulated industries, such as railroads and telephone companies. *See* P. Garfield & W. Lovejoy, *Public Utility Economics* 142–45 (1964). But it has distinct limitations and has been the subject of criticism. *See* Lander, *Public Utility Rate Design: The Cost of Service Method of Pricing*, 19 St. Louis U.L.J. 36, 44–46 (1974).[14] In any event, the reasons for departing from the otherwise nearly universal cost-of-service pricing in some particular situations does not exist in a water utility rate case where the "rate design" task involves merely the apportionment of the water company's total revenue requirement among its five separate divisions.

This is clearly so here since the total revenue requirement of Maine Water Company is simply the sum of the revenue requirements of its five divisions operating independently of one another in five separate communities.

We can find no precedent elsewhere to support the use of "value of service" as an excuse for allocating part of the cost of service of one water system to the customers of other independent water systems owned and operated by the same corporation. The lack of such precedent is perhaps not surprising. It is inherently unfair to impose upon the ratepayers of those other water systems costs that they do not contribute to or benefit from.

■ The shifting of part of Wiscasset's *cost of service to the other four divisions* was also invalid as an undue or unreasonable preference for Wiscasset and an undue or unreasonable prejudice to the other divisions. Both are prohibited and declared unlawful by 35 M.R.S.A. § 102 (Pamph. 1983–1984).[15] Section 102, it is true, prohibits only "undue or unreasonable" preference or prejudice. *See Gifford v. Central Maine Power Co.*, 217 A.2d 200 (Me.1966). In *Gifford*, both the Public Utilities Commission and this court, in the energy circumstances of that day, found that cost benefits to all customers justified an electric utility's promotional allowances designed to increase residential use of electricity. In the case at bar, "value of service"[16] provides no comparable justifica-

---

**14.** In his chapter on "The Traditional Issues in the Pricing of Public Utility Services," Alfred Kahn appropriately entitles one section as "The Limited Attention to Quality of Service." 1 A. Kahn, *The Economics of Regulation* 21–25 (1970). He does not suggest that the deficient quality of service rendered to one group of customers justifies imposing part of that group's cost of service on other customers.

**15.** In pertinent part, 35 M.R.S.A. § 102 reads as follows:

If any public utility makes or gives any undue or unreasonable preference or advantage to any particular person, firm or corporation or any undue or unreasonable prejudice or disadvantage in any respect whatever, such

public utility shall be deemed guilty of unjust discrimination which is prohibited and declared unlawful.

**16.** The Company initially argues that considerations of value of service should play no role in setting rates and that the Commission can only take into account economic factors. *See Central Maine Power Co. v. Public Util. Comm'n*, 455 A.2d 34, 47 (Me.1983) (Carter, J., dissenting). Whether or not "value of service" is in general a proper consideration in a rate case, the Commission in any event erred in using that consideration to justify shifting part of Wiscasset's cost of service to ratepayers outside Wiscasset. We therefore need not address the Company's initial argument.

tion for the discrimination worked among Maine Water's divisions. The fact that Wiscasset suffers from a serious and costly problem in acquiring an adequate public water supply does not make any less "undue or unreasonable" a "rate design" whereby Wiscasset customers pay less than their cost of service, while as a Commission-authorized offset customers in the other Maine Water communities are required to pay more than their cost of service. *Cf. Citizens Action Coalition of Indiana, Inc. v. Public Service Co. of Indiana,* 450 N.E.2d 98 (Ind.App.1983) (reduced "lifeline" rates for specific income or demographic groups violate statutory prohibition of unreasonable discrimination); *Mountain States Legal Foundation v. Public Utilities Commission,* 197 Colo. 56, 590 P.2d 495 (1979) (discounted gas rates for low-income elderly and low-income disabled, with revenue loss recovered by higher rates on all other customers, prohibited by antidiscrimination statute). *But see American Hoechest Corp. v. Department of Public Utilities,* 379 Mass. 408, 399 N.E.2d 1 (1980) (approval of short-term experiment with lifeline pricing based in part on expected cost-related results).

In conclusion, in the circumstances of this case, the Commission erred by using a value of service rationale to depart from fixing rates in each of the five divisions of Maine Water Company at the cost of rendering service in that division.

The entry is:

Orders of the Public Utilities Commission in its consolidated Dockets Nos. 83–105 (Oakland), 83–107 (Wiscasset), 83–108 (Freeport), 83–109 (Damariscotta-Newcastle), and 83–110 (Kezar Falls) reversed insofar as they relate to the Newport/Wilton issue and the Wiscasset water quality issue; otherwise affirmed.

We also do not reach the question whether the Commission erred in concluding, on the basis of a comparison with water rates elsewhere in Maine and of "the customer inconven-

Remanded for further proceedings consistent with the opinion herein.

All concurring.

iences caused by the impurities in the Wiscasset water," that the Wiscasset water was worth no more than existing rates.