2001 ME 94

**INDUSTRIAL ENERGY CONSUMER GROUP**

v.

**PUBLIC UTILITIES COMMISSION
et al.**

Supreme Judicial Court of Maine.

Argued: May 17, 2001.

Decided: June 22, 2001.

Anthony W. Buxton, Esq., (orally), Donald J. Sipe, Esq., Linda S. Lockhart, Esq., Preti Flaherty Beliveau Pachios & Haley, LLC, Augusta, for appellant.

Charles Cohen, Esq., (orally), Public Utilities Commission, Augusta, Catherine R. Connors, Esq., (orally), Kevin F. Gordon, Esq., Raymond W. Hepper, Esq., Pierce Atwood, Portland, (for Central Maine Power), Stephen G. Ward, Esq., Public Advocate, Beth A. Nagusky, Esq., Independent Energy Producers of Maine, Augusta, for appellees.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA *, SAUFLEY, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] The Industrial Energy Consumer Group,[1] ("IECG") appeals from an order issued by the Public Utilities Commission approving a Stipulation between the Central Maine Power Company ("CMP") and the Office of Public Advocate providing for an Alternative Rate Plan. We affirm the Commission's order.

## I. BACKGROUND

[¶ 2] In 1991, Title 35–A M.R.S.A. § 3195[2] was enacted, conferring on the Commission the authority to establish rea-

---

* Although not available at oral argument, Justice Dana participated in this opinion. *See* M.R.App. P. 12(a) (stating that a "qualified justice may participate in a decision even though not present at oral argument.").

1. IECG describes itself as "an incorporated trade association of industrial customers," whose membership includes: "International Paper/Bucksport Mill, Bucksport; Mead Corporation, Rumford; Wausau Mosinee Paper Corporation, Jay; Georgia Pacific Corporation, Old Town; National Semiconductor, South Portland; International Paper, Jay; The Chinet Company, Waterville; Portland Pipeline Corporation. South Portland; Forster Inc., Wilton; Gardiner Paperboard Corp., Gardiner; and Pratt & Whitney, North Berwick."

2. Section 3195 states in relevant part:

§ 3195. **Commission authority to promote transmission and distribution utility efficiency**

1. **Rate-adjustment mechanisms.** This Title may not be construed to prohibit the commission from or to restrict the commission in establishing or authorizing any reasonable rate-adjustment mechanisms to promote efficiency in transmission and distribution utility operations and least-cost planning. Rate-adjustment mechanism may include, but are not limited to:

A. Decoupling of utility profits from utility sales through revenue reconciliation;

B. Reconciliation of actual revenues or costs with projected revenues or costs, either on a total or per customer basis;

C. Adjustment of revenues based on reconciled, indexed or forecasted costs; and

D. Positive or negative financial incentives for efficient operations.

2. **Just and reasonable rates.** In determining the reasonableness of any rate-adjustment mechanism established under this subchapter, the commission shall ap-

ply the standards of section 301 to ensure that the rates resulting from the implementation of the mechanism are just and reasonable.

. . . .

4. **Ratepayer protection.** In determining the reasonableness of any rate-adjustment mechanisms, the commission shall consider the transfer of risks associated with the effect of the economy and the weather on the utility's sales. To the extent these risks are transferred from the utility to its customers, the commission shall consider in a rate proceeding the effect of the transfer of risk in determining a utility's allowed rate of return.

. . . .

35–A M.R.S.A. § 3195 (Supp.2000).

Section 301 states in relevant part:

§ 301. **Safe facilities; just and reasonable rates**

. . . .

2. **Rates.** The rate, toll or charge, or any joint rate made, exacted, demanded or collected by any public utility for production, transmission, delivery or furnishing of electricity, gas, heat or water; . . . shall be just and reasonable.

3. **Unreasonable rates prohibited.** Every unjust or unreasonable charge for public utility service is prohibited and declared unlawful.

4. **Determining rates.** In determining just and reasonable rates, the commission:

A. Shall provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms; and

B. Shall, to a level within the commission's discretion, consider whether the utility is operating as efficiently as possible and is utilizing sound management practices, including the treatment in rates of executive compensation.

35–A M.R.S.A. § 301 (1988 & Supp.2000).

sonable rate-adjustment mechanisms that promote efficiency in the transmission and distribution of utilities.

[¶ 3] In 1995, the Commission approved a stipulation, thereby implementing CMP's proposed multi-year alternative rate plan. That plan, referred to by the parties as "ARP 95," expired on December 31, 1999. When ARP 95 was implemented, CMP was an integrated utility providing generation, transmission, distribution, billing, and metering services.

[¶ 4] In 1997, the Legislature enacted Maine's Electric Industry Restructuring Act. See 35–A M.R.S.A. § 3201, et. seq. The Legislature also enacted 35–A M.R.S.A. § 3202, which deregulated electrical generation and provided that "[b]eginning on March 1, 2000, all consumers of electricity have the right to purchase generation services directly from competitive electricity providers." 35–A M.R.S.A. § 3202(1) (Supp.2000).

[¶ 5] Because the generation function was deregulated and since ARP 95 would soon expire, CMP filed a successor alternative rate plan, known as "ARP 2000," on September 20, 1999. No action was taken on CMP's filing by the Commission until March 2000. At that time, the Commission issued a Notice of Proceeding that provided interested parties with the opportunity to intervene. IECG was one such intervenor.

[¶ 6] ARP 2000 applies only to CMP's distribution delivery rates and services and includes both productivity offsets and an earnings sharing provision. Although the ARP 2000 does not provide for a "top end" earnings sharing, it does provide that earnings below a specified return on equity from the prior calendar year are to be shared fifty-fifty between shareholders and ratepayers.

[¶ 7] The ARP 2000 Stipulation also includes eight service indicators.[3] In the event that CMP's performance does not meet the established baseline for any indicator in a given year, CMP may be subject to considerable monetary penalties.

[¶ 8] After considering all proposals and testimony presented at the technical conferences, the Commission's advisory staff filed a 174–page Bench Analysis on June 22, 2000. The Commission subsequently received a stipulation signed by CMP and the Office of Public Advocate. The stipulation incorporated many of the recommendations contained in the Bench Analysis and provided for CMP to furnish distribution services for seven years, from January 1, 2001 through December 31, 2007.

[¶ 9] The Commission issued a procedural order allowing all non-signing parties to file objections to the stipulation. Pursuant to that order, IECG objected to the ARP 2000 Stipulation, but the Commission, nevertheless, approved the stipulation. IECG appeals the Commission's order approving the stipulation.

## II. DISCUSSION

### A.

[¶ 10] IECG argues that the Commission's order approving the stipulation violates the statutory requirement that rates be just and reasonable. IECG contends that the only way to determine if rates are just and reasonable is to determine a fair rate of return for the utility. Accordingly, if the utility receives an ex-

---

**3.** The service indicators include (1) Customer Average Interruption Duration Index, (2) System Average Interruption Frequency Index. (3) MPUC Complaint Ratio, (4) Percent of Business Calls Answered, (5) Percent of Outage Calls Answered, (6) New Service Installation, (7) Call Center Service Quality, and (8) Market Responsiveness.

cessive rate of return, IECG argues, then it follows that the customer's rates are no longer just and reasonable.

■ [¶ 11] We " 'defer to the Commission's choice of ratemaking methodologies or techniques.' " *Quirion v. Pub. Utils. Comm'n,* 684 A.2d 1294, 1297 (Me.1996) (quoting *Public Advocate v. P.U.C.,* 655 A.2d 1251, 1253 (Me.1995)). Because of this limited and deferential standard of review, we will not lightly substitute our judgment for that of the Commission. *New England Tel. & Tel. Co. v. Pub. Utils. Comm'n,* 448 A.2d 272, 279 (Me.1982) (citation omitted). It is "[o]nly when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can [we] intervene." *Id.* (citation omitted).

[¶ 12] The Commission's authority is governed by Title 35–A, the purpose of which is

> ... to ensure that there is a regulatory system for public utilities in the State that is consistent with the public interest and with other requirements of law and to provide for reasonable licensing requirements for competitive electricity providers. The basic purpose of this regulatory system is to ensure safe, reasonable and adequate service and to ensure that the rates of public utilities are just and reasonable to customers and public utilities.

35–A M.R.S.A. § 101 (Supp.2000). The basic purposes then, are to (1) ensure safe, reasonable, and adequate services and (2) to ensure that rates are "just and reasonable" for both the customer and the public utility. We are only concerned here with the second purpose.

[¶ 13] In determining whether a rate is "just and reasonable," the Commission "[s]hall provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms[,]" 35–A M.R.S.A. § 301(4)(A) (1988), and "[s]hall, to a level within the commission's discretion, consider whether the utility is operating as efficiently as possible and is utilizing sound management practices, including the treatment in rates of executive compensation," 35–A M.R.S.A. § 301(4)(B) (Supp. 2000).

[¶ 14] The ARP 2000 is a formula, or mechanism, that predicts distribution costs over a seven-year period and adjusts rates accordingly. The traditional annual ratemaking procedure can be very costly to both rate-payers and the utilities. Conversely, the structure of ARP 2000, by its very nature, removes the administrative costs associated with traditional rate-making, as it has an agreed upon adjustment formula that occurs automatically every year.[4]

4. The stipulation provides that:

Each July 1, beginning on July 1, 2001. CMP's core distribution rates ... will change to reflect a Price Index ("PI") subject to Paragraph 13. The PI will be calculated under the following formula:

PI= Inflation index—productivity offset +/− (mandated costs +/− net capital gains and losses) +/− expiring amortizations + earnings sharing − any service quality penalties.

The inflation index will be the Gross Domestic Product—Price Index.

The stipulation also provides for productivity offsets for each price change, as follows:

| Price Change Taking Place in: | Productivity Offset |
| --- | --- |
| 2001 | equal to inflation |
| 2002 | 2.00% |
| 2003 | 2.25% |
| 2004 | 2.75% |
| 2005 | 2.75% |
| 2006 | 2.75% |
| 2007 | 2.90% |

[¶ 15] The plain language of the statute grants the Commission the authority to authorize ARPs, such as CMP's ARP 2000, which promote efficiency in the distribution of electricity. *See* 35-A M.R.S.A. § 3195. The statute is permissive, i.e., "[r]ate-adjustment mechanisms *may* include ... [,]" *see* section 3195(1), suggesting that the Commission has broad discretion to promote efficiency in the transmission and distribution of electricity. Moreover, the statute specifically grants the Commission the discretion to authorize positive or negative financial incentives, such as those found in the ARP 2000.

[¶ 16] Title 35-A M.R.S.A. § 3195 must, however, be read in concert with 35-A M.R.S.A. § 301. *See supra* note 2. Therefore, while the Commission may authorize ARPs, it must also ensure that the rates resulting from such plans are just and reasonable. IECG argues that the only way to determine "just and reasonable" rates for consumers is to link rates to a reasonable rate of return for the utility. A utility's "rate of return"

> is expressed as a percentage figure and denotes the annual return to be allowed on the value of the utility's property devoted to public use. It might be considered as the interest rate which the utility earns on its investment in property serving the public. One of the primary functions of utility regulatory agencies in ratemaking proceedings is to determine the appropriate rate of return to be allowed the utilities under their jurisdiction.

*New England Tel. and Tel. Co. v. Pub. Utils. Comm'n,* 390 A.2d 8, 30 (Me.1978). We have previously held that the rate of return should neither be so low as to constitute an unconstitutional confiscation of private property, nor so high as to constitute an unreasonable burden on the ratepayers. *Id.* The order approving the stipulation noted that earnings sharing on a "50/50 basis would occur where earnings were either 350 basis points above or 350 basis points below the 10.5% ROE target established by the Commission in Docket No. 97-580 [a/k/a ARP 95]." The starting point, therefore, for ARP 2000 was the ARP 95, which has been adjudged to have had "just and reasonable" rates.

[¶ 17] The question then becomes whether the Commission, pursuant to section 3195, may approve a performance-based rate, rather than the traditional cost-based rate that has been the norm for decades. We addressed this issue in *Central Maine Power Company v. Public Utilities Commission,* 382 A.2d 302 (Me.1978) stating:

> We know of no persuasive authority, however, ... establishing a *per se* rule that all utility rates must be based solely on cost factors. On the contrary, the regulatory case law of this State and elsewhere is replete with consideration of issues other than actual cost.... The concept of a 'just and reasonable' rate does not signify a particular single rate as the only lawful rate but rather *encompasses a range within which rates may be deemed just and reasonable both in terms of revenue level and rate design.* It is within the sound discretion of the Commission to fix the exact level and design within that range....

*Cent. Me. Power Co. v. Pub. Utils. Comm'n,* 382 A.2d 302, 327-28 (Me.1978) (citations omitted) (emphasis and ellipsis added). Therefore, contrary to the IECG's argument, the Commission may contemplate other issues, in addition to rate of return, when determining whether a given rate is just and reasonable.

### B.

 [¶ 18] Having recognized that the statute allows for alternative rate plans that are not exclusively cost-based, the

next issue to be considered is whether the ARP 2000 stipulation falls in "a range within which rates may be deemed just and reasonable both in terms of revenue level and rate design." *See id.*

[¶ 19] The ARP 2000 Stipulation implements a rate cap system which is adjusted annually by a price index. The stipulation does not provide a top-end earnings sharing provision, but rather, provides that "revenue deficiencies below 5.3% return on equity from the calendar year prior to the price change are to be shared $^{50}/_{50}$ between shareholders and ratepayers." The Commission's order approving the stipulation noted that,

> ... [w]e conclude that the lack of an earnings sharing mechanism is not, in and of itself, dispositive of the question of whether rates ultimately produced by a price cap plan will be just and reasonable.
>
> . . . .
>
> Many price cap plans attempt to address the issue of 'overearnings,' or earnings above the most recently allowed rate of return, through an upper-end earnings sharing provision. While earnings sharing provisions lessen overearnings, they are not eliminated by such mechanisms. First, a utility may retain all overearnings to the extent such earnings are in the non-sharing or dead-band area. Second, even if overearnings exceed the dead-band, they are not eliminated but rather are reduced in proportion to the sharing ratio either agreed to or imposed by the regulator. It is possible then, depending on the circumstances, that a utility operating under a price cap plan with earnings sharing could have higher earnings and higher rates than a utility that has a plan without sharing but incorporates savings to ratepayers through a higher productivity offset.
>
> ... Therefore, although ARP 2000 lacks an upper end earnings sharing mechanism, ratepayers will receive[,] through its incorporation of high productivity offsets, substantial benefits during the course of the plan. We thus conclude that the plan, overall, is likely to produce rates that are just and reasonable.

[¶ 20] Traditional rate-based regulation methods cause a negative profit incentive for utilities to invest in demand-side management, i.e., consumer conservation programs. Under traditional ratemaking methodologies, utilities were not encouraged to develop conservation programs because every lost kilowatt hour of sales resulted in a lost profit to the utility. It appears, however, that the Legislature was familiar with this conservation disincentive because it enacted 35–A M.R.S.A. § 3211.[5]

[¶ 21] In the order approving the stipulation the Commission concluded that "the rate plan agreed to in the Stipulation, when looked at as a whole, is fair, reasonable and in the public interest." The Commission further noted that "[d]uring the course of the ARP [the] productivity offsets will serve to decrease rates in 'constant dollar' terms by 18.0%." Commenting

---

**5.** Section 3211 states in relevant part:

> **§ 3211. Conservation programs**
>
> . . . .
>
> **2. Programs.** Beginning March 1, 2000, to the extent funding is available pursuant to subsection 4, the commission shall require transmission and distribution utilities to implement energy conservation programs.
>
> . . . .
>
> **7. Cost recovery.** The commission shall include the cost of conservation programs, including any assessment collected pursuant to subsection 6, in the rates of transmission and distribution utilities.

35–A M.R.S.A. § 3211 (Supp.2000).

on other substantive parts of the stipulation, the Commission stated that,

> ... [t]he Stipulation moves the ARP 95 CAIDI standard of 3.0 hours to 2.58 hours and the SAIFI standard of 2.0 interruptions per customer to 1.8 interruptions per customer. The Stipulation includes new standards for service installation, answering both business and outage calls and properly completing enrollments from competitive electricity providers. In addition, the Stipulation increases the maximum penalty level from the $3.0 million level contained in ARP 95 to $3.6 million, despite the fact that the Company's revenues have decreased by about one-third as a result of restructuring. The Stipulation also provides for a mid-period review of service quality issues to take place in 2003. We thus find that the service quality standards agreed to significantly strengthen the standards from those contained in ARP 95, ... and helps to ensure that earnings during ARP 2000 are not enhanced by the utility's providing inadequate or unreliable service.

We find that the benefits of high productivity offsets and strengthened service quality standards outweigh the detriments alleged by the objecting parties. Specifically, we do not believe ratepayers are significantly harmed by the absence of top-end earnings sharing....

We also believe that, given the scope of this ARP, the probability of extremely high earnings is small....

[¶ 22] Based on our review of the record we cannot conclude that the Commission exceeded the authority entrusted to it, nor did it fail to follow the mandate of the legislature, by approving the ARP 2000 Stipulation; the plain language of the statute encourages such plans. *See New England Tel. & Tel. Co.*, 448 A.2d at 279. This determination is further supported by the fact that the Commission held numerous hearings, crafted a lengthy bench analysis, specifically considered and rejected IECG's concerns regarding the ARP 2000 Stipulation, and supported its decision with numerous findings of fact. Under these circumstances, we defer to the Commission's expert judgment in choosing among various ratemaking methodologies, including those found in the ARP 2000 Stipulation. *See id.*

### C.

[¶ 23] The IECG also argues that "no mechanism exists in the stipulation to reduce rates if [CMP collects excessive revenues]." The IECG's contentions are without merit because 35–A M.R.S.A. § 112[6]

---

6. Section 112 states in pertinent part:

§ 112. **Power to obtain information**

**1.** **Investigation of management of business.** The commission may inquire into the management of the business of all public utilities and shall keep itself informed as to the manner and method in which each is conducted.

**2.** **Facilities and information to be furnished.** Every public utility shall furnish the commission with:

**A.** All reasonable facilities for the prompt and faithful discharge of its duties; and

**B.** All information necessary to perform its duties and carry into effect this Title.

If it is unable to furnish the information, it shall give a good and sufficient reason for the failure, and the reason for the failure shall be verified by an officer, owner or agent of the public utility and returned to the commission at its office within the time fixed by the commission.

**3.** **Inspection of books and papers; confidentiality.** The following provisions apply to inspection of books and papers.

**A.** The commission or any commissioner or any person employed by it for that purpose, may upon demand inspect and copy the books, accounts, papers, records and memoranda of any public utility in relation to its business and affairs.

....

explicitly gives the Commission the authority to question CMP, at any time, on matters regarding the "management of [its] business" and to "inspect and copy [CMP's] books, accounts ...[,]" and other records. *See* 35–A M.R.S.A. § 112(1) and 35–A M.R.S.A. § 506.[7] There is no language in the stipulation that prevents the Commission from ordering a reduction in the event that CMP's rate of return is excessive. Moreover, any customer, including any IECG client who receives distribution services from CMP, may request a review, or file a complaint, with the Commission regarding CMP's rates and earnings. The only parties that cannot initiate a rate increase or decrease are CMP and the Office of the Public Advocate.[8]

The entry is:

Order affirmed.

---

35–A M.R.S.A. § 112 (1988 & Supp.2000).

7. Section 506 states in pertinent part:
 **§ 506. Inspection of books and records**
 The agents, accountants or examiners employed by the commission shall have authority inside or outside the State under the direction of the commission to inspect and examine the books, accounts, papers, records and memoranda kept by any public utility.
 35–A M.R.S.A. § 506 (1988).

8. The Stipulation states that "[t]here shall be no cap on CMP's earnings and there shall be no earnings sharing if CMP's earnings rise above any level; furthermore, the Parties agree that if the Commission is asked to review CMP's revenue requirement during the seven-year term of ARP 2000, the Parties shall oppose such review or resetting as in contravention of this Stipulation...."