2012 ME 21

**ANTHEM HEALTH PLANS
OF MAINE, INC.,**

v.

**SUPERINTENDENT OF
INSURANCE et al.**

Supreme Judicial Court of Maine.

Argued: Nov. 8, 2011.
Decided: Feb. 28, 2012.

Christopher T. Roach, Esq. (orally), Catherine R. Connors, Esq., and Joshua D. Dunlap, Esq., Pierce Atwood LLP, Portland, for appellant Anthem Health Plans of Maine, Inc.

William J. Schneider, Attorney General, and Thomas C. Sturtevant, Jr. (orally), Jonathan R. Bolton, Andrew L. Black, Christina M. Moylan, and Scott W. Boak, Asst. Attys. Gen., Office of the Attorney General, Augusta, for appellees Superintendent of Insurance and Attorney General.

Joseph Ditré, Esq., and Andrea Irwin, Esq., Consumers for Affordable Health Care, Augusta, for appellee Consumers for Affordable Health Care.

Rufus E. Brown, Esq., Brown & Burke, Portland, for amicus curiae National Association of Insurance Commissioners.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1] Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield (Anthem), appeals from the judgment entered in the Business and Consumer Docket (*Humphrey, C.J.*) pursuant to M.R. Civ. P. 80C affirming a decision by the Superintendent of Insurance (1) determining that Anthem's proposed rate increase for its individual health insurance products—an increase of 9.2% that contained a built-in risk and profit margin of 3% for those products—was excessive and unfairly discriminatory; and (2) indicating that an average rate increase of 5.2%, containing a built-in risk and profit margin of 1% for the period from July 1, 2011 through June 30, 2012, would be approved. Anthem contends that the Superintendent's decision violates 24–A M.R.S. § 2736 (2011) and the United States and Maine Constitutions because the approved rate increase eliminates Anthem's opportunity to earn a reasonable profit on its line of individual health insurance products in Maine. We disagree and affirm.

## I. BACKGROUND

[¶ 2] In this expedited appeal, Anthem appeals from the judgment affirming a decision of the Superintendent of Insurance (Superintendent) regarding the rates approved for the rate period between July 1, 2011, and June 30, 2012.

[¶ 3] The facts are not in dispute. In Maine, the rates for Anthem's group health insurance products are unregulated and subject to market forces, while rates for Anthem's individual health insurance products are regulated pursuant to 24–A M.R.S. §§ 2736 to 2736–C (2011). Section 2736(1) provides that "[e]very insurer shall file for approval by the superintendent every rate, rating formula, classification of risks and every modification of any formula or classification that it proposes to use in connection with individual health insurance policies...."[1] The Superintendent is vested with the authority "to determine whether such filing meets the requirements that rates not be excessive, inadequate or unfairly discriminatory." *Id.* § 2736(2).[2]

[¶ 4] On January 28, 2011, Anthem filed proposed revised rates for the company's individual health insurance products—HealthChoice, HealthChoice HDHP, HealthChoice Standard and Basic, HMO Standard and Basic, and Lumenos Consumer Directed Health Plan—to become effective on July 1, 2011. Anthem's initial rate proposal for its line of individual health plans would have resulted in an average rate increase of 9.7% for nearly 11,000 Anthem policyholders. Anthem built into its proposed 2011 rates a "3% ... targeted pre-tax profit and risk component ... solely in recognition of the Superintendent's prior orders." On February 7, 2011, March 2, 2011, and March 31, 2011, Anthem filed revisions to the initial filing to correct errors and to provide the Superintendent with additional

1. Insurance carriers who provide individual health insurance products in Maine are required to review and adjust rates annually by submitting information on proposed rate revisions to the Superintendent. 6 C.M.R. 02 31 940–2 § 6(D) (2010).

2. If the Superintendent "has reason to believe that a filing does not meet the requirements that rates not be excessive, inadequate or unfairly discriminatory," the Superintendent must hold a hearing at which it is the insurer's burden to prove that the proposed rates "are not excessive, inadequate or unfairly discriminatory." 24–A M.R.S. § 2736–A (2011).

data and information. By the time of the hearing, Anthem had modified its proposed average rate increase to 9.2% and included in the various revised submissions a requested risk and profit margin that fluctuated between 2.3% and 2.5%. However, Anthem maintains in this appeal that any approved rate should include at least a 3% risk and profit margin.

[¶ 5] Between March 14 and April 13, 2011, the Superintendent held five public hearings where she admitted into evidence the sworn testimony of public commenters and the submissions of Anthem, the Attorney General, and party-in-interest Consumers for Affordable Health Care (Consumers).

[¶ 6] The Superintendent issued the decision and order that is the subject of this appeal on May 12, 2011. Critical to our analysis, the Superintendent interpreted the statutory mandate of 24–A M.R.S. § 2736(2) as requiring a balancing between a rate that would not threaten the "financial integrity" of insurers and "the legitimate government interests of protecting the viability of the insurance pool, keeping insurance premiums as reasonable as possible, and minimizing adverse selection."

[¶ 7] In applying her interpretation of the requirement that the rates not be "inadequate," the Superintendent noted that from 1999 to 2010 Anthem's individual insurance product lines in Maine resulted in a "pre-tax operating gain ... [of] over $15.5 million and averaged 2.1% of total revenue." The Superintendent recognized, consistent with the testimony of Anthem's representatives, that the profits from Anthem's line of individual insurance products were integrated into a "consolidated, company-wide surplus [that] is available both to meet all financial obligations of the corporation, including all insurance claims from all lines of business, and to pay shareholder dividends to the parent corporation." On the basis of her opinion that the adequacy (or inadequacy) of Anthem's proposed rates should be viewed through the lens of Anthem's overall corporate health, the Superintendent found that Anthem's "[p]rofits, including those achieved from Anthem's individual health insurance business in [Maine]," contributed to a company-wide surplus that "increased from $209,500,000 in 2009 to $229,100,000 in 2010." As a result of the overall profitability of the company's health insurance products, including the pre-tax profitability trend of the individual product lines,[3] the Superintendent found that between 2007 and 2010 Anthem was able to make dividend payments of over $184 million, including over $20 million in 2010 alone, to its corporate parent.

[¶ 8] Against the weight of Anthem's individual product line profitability and Anthem's company-wide success, the Superintendent cited the sworn testimony of nearly forty Anthem policyholders who indicated that Anthem's average proposed rate increase would intensify their already difficult individual financial situations and threaten "their corresponding ability (or inability) to stay insured." In order to protect the public interest in maintaining "affordable individual health insurance rates to the fullest extent possible" and alleviate "the concern that rising rates have caused adverse selection[4] in An-

---

3. The Superintendent found, consistent with Anthem's rate submissions, that the 2010 approved rate increase, which included a 0.5% built-in risk and profit margin, had netted Anthem a pre-tax profit of 2.5%, or $1,542,000.

4. Adverse selection is a term of art used in the insurance field to describe the phenomenon in which groups of insureds "will have a higher proportion of less desirable risks because more applications for the insurance will tend to come from those who get a better

them's individual insurance business," the Superintendent ultimately concluded that Anthem's proposed average rate increase of 9.2%,[5] which included a 3% built-in risk and profit margin, was "not inadequate," but was "excessive and unfairly discriminatory in contravention of section 2736." As part of her conclusion, the Superintendent specifically identified the problematic dimension of Anthem's proposed 3% risk and profit margin: "While Anthem's 3% risk and profit margin in its 2011 rate development might be appropriate under a different evidentiary record, ... it would contribute to making this year's 9.7% [*sic*] requested average rate increase excessive."

[¶ 9] The Superintendent advised in the May 12 decision that she would approve a 5.2% average rate increase with a 1% built-in risk and profit margin. Immediately following that decision, Anthem submitted a revised filing intended to comply with its terms. The Superintendent issued a subsequent order on May 18, 2011, putting into effect the approved 5.2% rate increase and corresponding 1% built-in risk and profit margin. *See* 24-A M.R.S. § 2736-B.

[¶ 10] Anthem filed a petition for review of final agency action in the Superior Court pursuant to M.R. Civ. P. 80C and 5 M.R.S. § 11002 (2011). Anthem requested that the Superintendent's May 12 decision be vacated and remanded so that the Superintendent could "undertake the proper analysis to design rates that include a fair and reasonable rate of return," which Anthem contends should include approving at least a 3% built-in risk and profit margin as initially proposed. The court affirmed the Superintendent's decision on August 29, 2011. Anthem filed this timely, expedited appeal in hopes of avoiding the mootness inquiry that guided our decision in *Anthem Health Plans of Me., Inc. v. Superintendent of Ins.*, 2011 ME 48, 18 A.3d 824. Because the 2011 rates that the Superintendent approved remain in effect until June 30, 2012, the issue of whether the Superintendent committed legal error in disapproving Anthem's proposed rates is ripe for review.

## II. DISCUSSION

[¶ 11] In this appeal the parties primarily dispute the definition of "inadequate" that the Superintendent used in approving a 5.2% average rate increase for Anthem's health insurance products. The Superintendent's interpretation of "inadequate" as a standard that protects an insurer's "financial integrity" comports with the majority of other jurisdictions that define an "inadequate" rate as one that either threatens an insurer's solvency or would tend to destroy competition or create a monopoly,[6] or as a rate that is insuffi-

---

bargain." 1 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 1.01(4)(b) (2011).

5. As noted by the Attorney General in its brief, the Superintendent inadvertently referenced Anthem's initially proposed 9.7% average rate increase rather than the amended 9.2% average rate increase in the May 12, 2011, decision and order.

6. *See* Cal. Ins.Code § 12401.3(a) (West 2011); Conn. Gen.Stat. Ann. §§ 38a–665(a), 686(a)(2) (West 2011); Ga.Code Ann. § 33–9–4(3) (West 2011); 22 Guam Code Ann. § 18502(c) (2011); Idaho Code Ann. § 41–1405(3) (2011); La.Rev.Stat. Ann. § 22:1452(C)(9) (West 2011); Md.Code Ann., Ins. § 11–306(b)(3)(i)–(ii) (West 2011); Mass. Gen. Laws Ann. ch. 175E, § 4(a) (West 2011); Mich. Comp. Laws Ann. §§ 500.2109(b), 500.2403(1)(d), 500.2603(1)(d) (West 2011); Miss.Code Ann. § 83–2–3(1)(c) (West 2011); Mo. Ann. Stat. § 379.470(3) (West 2011); Mont.Code Ann. § 33–16–201(1)(c) (West 2011); Neb.Rev.Stat. Ann. § 44–7510(2) (LexisNexis 2011); N.H.Rev.Stat. Ann. § 412:15(I)(c)(1)-(2) (West 2011); N.C. Gen.

cient to cover an insurer's anticipated costs and obligations in providing a particular class of insurance.[7]

[¶ 12] Anthem argues that the Superintendent's interpretation of the term "inadequate" improperly shifts the focus of the rate inquiry from "protecting the insurer's side of th[e] regulatory bargain," which would be accomplished by approving a rate that includes a constitutionally mandated "fair and reasonable rate of return," to an inquiry that protects only policyholders from a rate that would threaten the solvency of the insurers. In other words, Anthem argues that the insurance rates approved by the Superintendent in this instance are inadequate not because a profit margin was not considered, but because Anthem is entitled to "a fair and reasonable rate of return," which it defines as a rate that must include a built-in 3% risk and profit margin consistent with the industry-wide average.

A. Standard of Review

[¶ 13] We review a decision of the Superintendent directly for an abuse of discretion, error of law, or findings not supported by the evidence. *York Ins. of Me., Inc. v. Superintendent of Ins.*, 2004 ME 45, ¶ 13, 845 A.2d 1155. We will generally uphold an administrative rating decision "so long as it is reasonable and supported by substantial evidence." *Me. Water Co. v. Pub. Utilities Comm'n*, 482 A.2d 443, 451 (Me.1984). We "accord due consideration to the Superintendent's interpretation and application of technical statutes and regulations and will overturn the Superintendent's action only if the statute or regulation plainly compels a contrary result." *Me. AFL–CIO v. Superintendent of Ins.*, 595 A.2d 424, 429 (Me.1991). Anthem requests that we determine whether the Superintendent's interpretation of the "not ... inadequate" language violates the letter and intent of 24–A M.R.S. § 2736(2) and the United States and Maine Constitutions. *See Anthem*, 2011 ME 48, ¶ 17, 18 A.3d 824 (Levy and Mead, JJ., dissenting).

[¶ 14] Having previously discerned that the phrase "not ... inadequate" as used in 24–A M.R.S. § 2736(2) is ambiguous, *Anthem*, 2011 ME 48, ¶ 12, 18 A.3d 824, we review the Superintendent's interpretation of the ambiguous statutory term for reasonableness and accord "great deference" to the Superintendent's interpretation unless the statute plainly compels a contrary result. *Dep't of Corr. v. Pub. Utilities Comm'n*, 2009 ME 40, ¶ 8, 968 A.2d 1047 (quotation marks omitted). There is no dispute that the term "inadequate" is not expressly defined in 24–A M.R.S. § 2736(2) and is, as argued by the parties

Stat. Ann. § 58–40–20(d)(1)–(4) (West 2011); Or.Rev.Stat. Ann. § 737.310(2)(b)(A)-(B) (West 2011); 77 Pa.Stat. Ann. § 1035.4(a)(3)(i)-(ii) (West 2011); Tex. Ins. Code Ann. §§ 560.002(c)(1)(A)-(B), 2251.051(C)(1)-(2) (Vernon 2011); Va.Code Ann. § 38.2–1904(A)(2) (West 2011); Wyo. Stat. Ann. § 26–14–103(a)(iv) (West 2011).

7. *See* Ariz.Rev.Stat. Ann. § 20–356(1) (2011); Ark.Code Ann. § 23–67–208(c) (West 2011); Colo.Rev.Stat. Ann. § 10–4–403(1)(b) (West 2011); Conn. Gen.Stat. Ann. § 38a–418(c) (West 2011); Del.Code Ann. tit. 18, § 2604(a)(2)(a)-(b) (2011); Fla. Stat. Ann. § 624.482(3) (West 2011); 215 Ill. Comp. Stat. Ann. 5/456(1)(d) (West 2011); Ind.Code Ann. § 27–1–22–3(a)(4) (West 2011); Kan. Stat. Ann. § 40–953 (West 2011); Minn.Stat. Ann. § 70A.04(3) (West 2011); Nev.Rev.Stat. Ann. § 686B.050(3) (West 2011); N.M. Stat. Ann. § 59A–17–6(D) (West 2011); R.I. Gen. Laws § 27–44–5(c) (2011); S.C.Code Ann. § 38–75–970(C) (2011); Tenn.Code Ann. § 56–5–303(c) (West 2011); Utah Code Ann. § 31A–19a–201(3)(a)-(b) (West 2011); Vt. Stat. Ann. tit. 8, § 4685(c) (2011); V.I.Code Ann. tit. 22 § 1491(c) (2011); W. Va.Code Ann. § 23–2C–18(e) (West 2011); Wis. Stat. Ann. § 625.11(3) (West 2011); Wyo. Stat. Ann. § 26–23–325(c) (2011).

here, reasonably susceptible to two meanings. *Id.*

B. The 24–A M.R.S. § 2736(2) Rate Approval Process

[¶ 15] The parties have offered differing opinions on what they think the term "inadequate" means in the context of the rate approval process for individual health insurance products in Maine. Anthem disputes whether the Superintendent's definition of the term falls within the broad parameters of reasonableness. Anthem argues that "inadequate" is a term of art in the insurance rating field that can only be applied and understood as guaranteeing insurers a reasonable profit on regulated insurance products. We agree that the inadequacy component of the rate approval scheme contained in 24–A M.R.S. § 2736(2) generally protects an insurer's interest in remaining a financially viable provider. However, we do not agree with Anthem's position that a built-in risk and profit margin is guaranteed by the definition of "inadequate," or by the rating approval framework for individual health insurance products more generally.[8]

[¶ 16] Unlike other statutory provisions in the Maine Insurance Code, e.g., 24–A M.R.S. § 2303(1)(C)(3) (2011) and 24–A M.R.S. § 2382(5)(C) (2011), there is no provision in 24–A M.R.S. § 2736(2) requiring the Superintendent to consider an insurer's reasonable profits in approving rates for individual health insurance products. In approving rates for casualty, surety, property, marine, inland marine, and title insurance, section 2303(1)(C)(3) requires that the Superintendent give "[d]ue consideration ... [t]o a reasonable margin for underwriting profit and contin-

gencies." Similarly, in the rating standards applicable to workers' compensation insurance, section 2382(5)(C) provides that "[r]ates may contain provision for contingencies and allowance permitting a reasonable profit." If an insurer includes a profit provision, the onus then falls on the Superintendent to determine "the reasonableness of [the] profit, consider[ing] ... all investment income attributable to premiums, the reserves associated with those premiums and the amount of capital and surplus allocable to the coverage of risks in the State." *Id.* In what may be the best evidence of the Legislature's intent concerning the rating approval scheme for individual health insurance products pursuant to 24–A M.R.S. § 2736(2), health insurance is specifically excluded from the rating standards that are applied in approving rates for casualty, surety, property, and other insurance products regulated by the Superintendent. *See* 24–A M.R.S. § 2302(2)(B) (providing that the general "making of rates" provision contained in 24–A M.R.S. § 2303, which requires the Superintendent to give "due consideration" to a reasonable margin for underwriting profit in approving rates, "shall not apply to ... [h]ealth insurance").

■ [¶ 17] These provisions make clear that, although a profit margin may be included and must be considered by the Superintendent in approving rates for other types of regulated insurance products in Maine, when the Superintendent approves health insurance rates, there is no statutory requirement that the Superintendent consider a profit margin, let alone that the approved rates include a reasonable profit. *See* 24–A M.R.S. §§ 2303(1)(C)(3), 2382(5)(C). If the Legislature had intended

8. Oklahoma stands as the lone outlier among the states insofar as its insurance code defines an "inadequate rate," in the alternative, as a rate that "is insufficient to cover projected losses, expenses and a reasonable margin for profit for the line of insurance coverage to be offered ... by the filer." Okla. Stat. Ann. tit. 36, § 902(2)(c) (West 2011).

that the Superintendent give "due consideration" to a reasonable profit margin or include in the approved rate a reasonable profit margin guaranteeing a health insurer's profits somewhere near the industry-wide average of 3%—either through the definition of "inadequate" or through a standalone profit provision—then the Legislature could have affirmatively imposed those requirements in 24–A M.R.S. § 2736, as it did in other sections of the Maine Insurance Code.[9] *See Anderson v. Cape Elizabeth Sch. Bd.*, 472 A.2d 419, 421 (Me. 1984) ("In the absence of any manifest legislative intent to the contrary, statutes must be construed in accordance with the natural import of the terms used without resort to subtle and forced constructions for the purpose of limiting or extending their operation.").

[¶ 18] The Superintendent's interpretation of the term "inadequate" passes the reasonableness test, not only because her definition incorporates the various definitional components of "inadequate" used by a significant majority of other jurisdictions, but also because 24–A M.R.S. § 2736 is devoid of any language suggesting that the Superintendent must consider an insurer's profit in approving rates for individual health insurance products. In short, there is nothing in the language or statutory framework of 24–A M.R.S. § 2736(2) that compels a definition of "inadequate" contrary to the "financial integrity" definition used by the Superintendent.[10]

[¶ 19] Although the "not inadequate" standard protects an insurer's "financial integrity" or its ability to cover the costs associated with offering an insurance product, concern for the insurer's financial position is balanced by the competing statutory demand that the Superintendent analyze whether a proposed rate is "excessive." 24–A M.R.S. § 2736(2). Anthem does not dispute that the term "excessive," as the Superintendent interpreted it in the context of the 24–A M.R.S. § 2736(2) rate approval scheme, generally protects the interest of existing and potential consumers by maintaining premium rates at levels that will "protect[ ] the viability of the [individual] insurance pool, keep[ ] premiums as reasonable as possible, and minimize[ ] adverse selection."

[¶ 20] In a contention that became more clear at oral argument, the Attorney General advocated a position that the term

---

9. An examination of the statutes governing the administrative rating of insurance rates in other jurisdictions shows generally that if an insurer's profits are to be "considered" as a factor in the rate approval process, then that command is explicitly incorporated into the statutory scheme. *See, e.g.*, Ariz.Rev.Stat. Ann. § 20–356(2); Cal. Ins.Code § 12401.3(b); Conn. Gen.Stat. Ann. §§ 38a–418(e), 665(b), 686(b)(1); Del.Code Ann. tit. 18, § 2604(b)(5); Ga.Code Ann. § 33–9–4(4); 22 Guam Code Ann. § 18502(d); 215 Ill. Comp. Stat. Ann. 5/456(1)(a); Ind.Code Ann. § 27–1–22–3(a)(1); Md.Code Ann. Ins. § 11–306(c)(3); Mass. Gen. Laws Ann. ch. 175E, § 4(b); Mich. Comp. Laws Ann. §§ 500.2403(1)(a), 500.2603(1)(a); Miss.Code Ann. § 83–2–3(2)(a); Mo. Ann. Stat. § 379.470(4); Mont.Code Ann. § 33–16–201(2)(a); Neb.Rev.Stat. Ann. § 44–7510(1); N.H.Rev.Stat. Ann. § 412:15(II)(a); Or.Rev. Stat. Ann. § 737.310(4); 77 Pa.Stat. Ann. § 1035.4(b)(3); R.I Gen. Laws § 27–44–5(e)(4); S.C.Code Ann. § 38–75–970(E); Va. Code Ann. § 38.2–1904(B)(1)(iii); Wyo. Stat. Ann. § 26–23–325(e).

10. We note additionally that the Superintendent's interpretation of "inadequate" is nearly identical to the definition of "inadequate" that appears in Maine's Workers' Compensation Rating Act: "A rate is not inadequate unless *insufficient to sustain projected losses and expenses and the use of the rate has had a tendency to create a monopoly or, if continued, will tend to create a monopoly in the market or will cause serious financial harm to the insurer*." 24–A M.R.S. § 2382(3) (2011) (emphasis added).

"inadequate" operates as a floor and the term "excessive" operates as a ceiling on what may be considered a reasonable rate increase under any set of circumstances. As with any highly regulated industry, the rate approved for annual premium increases for any given year may ultimately depend on economic conditions not within the control of the Superintendent, the insurer, or the insureds. The Superintendent, as the administrative officer charged with approving rates for individual insurance products in Maine, is and should be given a considerable degree of latitude in selecting a rate that is sufficient to meet the statutory mandate that the rate "not be excessive, inadequate or ... discriminatory[.]" 24–A M.R.S. § 2736(2).

■ [¶ 21] We conclude that the Superintendent applied reasonable interpretations of the statutory terms "inadequate" and "excessive," and employed a reasonable approach in arriving at her decision that Anthem's proposed rate increase of 9.2%, with a 3% built-in risk and profit margin, was "excessive." She properly concluded that a rate increase of 5.2% with a built-in risk and profit margin of 1% was "not inadequate" using the balancing analysis required by 24–A M.R.S. § 2736(2). The Superintendent succinctly stated this approach in her decision:

> Whether and to what extent Maine law *requires* regulated individual health insurance rates to include a projected profit margin as Anthem maintains, the ... determination of what is an approvable rate for a one-year period (including what, if any, built-in expected profit to provide) involves a balancing of investor and consumer interests. In other words, the *amount* at which to approve a built-in expected profit in regulated rates, must balance the need for a rate not to threaten the company's or enterprise's financial integrity against the legitimate government interests of protecting the viability of the insurance pool, keeping insurance premiums as reasonable as possible, and minimizing adverse selection. There is no bright-line test. The analysis involves a factual inquiry based on the evidence in the record at the time of the rate review.

The Superintendent's construction of the overall rating scheme recognizes the tension between a proposed rate's excessiveness and its inadequacy. The definitions the Superintendent employed in striking this balance are not so different from the authority Anthem cites for the proposition that an approved rate must ultimately lie somewhere between one that is not confiscatory and one that does not, because of its perceived excessiveness, pose an undue burden on existing and potential consumers. *See Calfarm Ins. Co. v. Deukmejian,* 48 Cal.3d 805, 258 Cal.Rptr. 161, 771 P.2d 1247, 1256–57 (1989);[11] *Mass. Bonding &*

---

11. Anthem relies heavily on the California Supreme Court's decision in *Calfarm* for the proposition that employing a solvency standard offends general rate-making principles and requests a conclusion that an inadequate rate—one that does not account for a reasonable return or reasonable profits—is per se confiscatory and unconstitutional. *Calfarm,* 258 Cal.Rptr. 161, 771 P.2d at 1252–59. *Calfarm,* however, is distinguishable on its facts. In this case, we are not dealing with a ballot initiative measure that would require insurers to immediately reduce premium rates by twenty percent without a means to pursue individualized relief from rates (unless "substantially threatened with insolvency") that would be plainly insufficient for the various insurers to either cover their losses or make a fair rate of return. *Id.* The question of whether the Superintendent was required to include, as a matter of law, a "built-in" profit margin in the context of approving or disapproving Anthem's proposed rate increase presents an entirely different question. *See* 24–A M.R.S. § 2736(2).

*Ins. Co. v. Comm'r of Ins.*, 329 Mass. 265, 107 N.E.2d 807, 811 (1952).

[¶ 22] Faced with the testimony from nearly forty existing Anthem individual health plan subscribers who described the additional financial hardship a 9.2% average rate increase would impose upon them, the Superintendent did not err in concluding that the 3% built-in risk and profit margin Anthem initially proposed would have contributed to what she considered an "excessive" rate increase. We accord the ordinary degree of deference to the Superintendent's interpretation of the language in 24–A M.R.S. § 2736(2) and the balancing analysis the Superintendent employed in discharging the statutory command of 24–A M.R.S. § 2736(2). We thus find no error in the Superintendent's approval of a rate average increase of 5.2% with a built-in 1% risk and profit margin in view of her conclusion that the rate, so approved, would neither be excessive for consumers, nor inadequate for Anthem.

## C. Cross–Subsidization and Confiscatory Taking

[¶ 23] Because the Superintendent provided for a built-in 1% risk and profit margin, Anthem's arguments regarding cross-subsidization and confiscatory taking are without merit. An examination of the financial picture of the regulated individual insurance lines shows that Anthem will not have to rely on its group customers, its surplus, or its equity in the business to "subsidize" its regulated line.[12]

[¶ 24] Even if we were to accept Anthem's argument that the general prohibition against cross-subsidization applied in utility ratemaking similarly applies to the statutory framework of 24–A M.R.S. § 2736, Anthem has provided no evidence that cross-subsidization is in fact occurring in this case. The anti-cross-subsidization principle announced in *Me. Water Co.*, 482 A.2d at 455–57, would require Anthem to establish that the allegedly "inadequate" rates approved by the Superintendent are causing a situation where the costs of paying for and providing the individual product lines are being borne by a corresponding increase in the rates of Anthem's non-regulated group insurance. *See id.* at 455–56 (recognizing the "fundamental objective in utility ratemaking ... that customers who benefit from a service should bear the costs of providing that service." (quotation marks omitted)).

[¶ 25] There is no evidence in the record to suggest that the approved rate increases will inexorably result in higher rates being charged to Anthem's unregulated group insurance consumers. To say that Anthem might occasionally need to use its substantial company-wide surplus, which we agree is funded in large part by the financial success of its unregulated group insurance products, to pay for intermittent losses sustained by the individual lines, is both in form and substance a different statement than saying that its group consumers are in fact being charged higher rates in order to subsidize the regulated lines. Without some discernable proof that cross-subsidization is occurring as a result of the rate approved by the Superintendent that included a 1% risk and profit margin, Anthem's argument falls short of persuading us that the Superintendent overstepped the bounds of her statutory authority by using her concept of the "inadequate" standard as a vehicle to

---

12. It is not necessary for us to decide the propriety of the Superintendent's decision to consider the financial health of Anthem's overall business in determining the rate for the regulated lines because we have determined that the financial projections of the regulated line, even at the rate approved by the Superintendent here, provide sufficient profit to make the issues of cross-subsidization and unconstitutional taking irrelevant.

consider the financial health of the company as a whole. *See Blue Cross of Kan., Inc. v. Bell,* 227 Kan. 426, 607 P.2d 498, 508 (1980) (providing that the evidence must show as a factual matter "that a rate structure in fact imposes on one class [the] costs created by another"). This conclusion is bolstered by the profit generated by Anthem's individual health insurance products since 2000, not only covering the costs associated with providing individual coverage, but also contributing to Anthem's company-wide surplus.[13]

[¶ 26] Finally, there is no evidence that a confiscatory taking has occurred in violation of the United States or Maine Constitutions. The Fifth Amendment to the United States Constitution provides that private property may not be taken for public use without just compensation. U.S. Const. amend. V. Maine's constitutional counterpart provides that "[p]rivate property shall not be taken for public uses without just compensation; nor unless the public exigencies require it." Me. Const. art. I, § 21. We have long interpreted these provisions similarly. *See Bell v. Town of Wells,* 557 A.2d 168, 177–78 (Me.1989).

[¶ 27] We have intimated that a "confiscatory rate" occurs in the insurance rating field where the approved rate denies a regulated entity "the opportunity to realize a reasonable return on [its] investment" and where "the inadequate return results directly from the rate approval process and not from other causes." *Nat'l Council on Comp. Ins. v. Superintendent of Ins.,* 481 A.2d 775, 781 (Me.1984).

[¶ 28] For the purposes of analyzing Anthem's claim of confiscatory taking, we generally accept the proposition that an insurer subjecting itself to a regulatory rating scheme cannot be forced to operate its business at a loss or at such legislatively imposed, diminished margins that the risk of a confiscatory taking would be manifest. *See Calfarm,* 258 Cal.Rptr. 161, 771 P.2d at 1255. But this is not the situation Anthem faces under the Superintendent's construction of 24–A M.R.S. § 2736(2). By Anthem's own estimation, the approved 5.2% average rate increase, which includes a 1% risk and profit margin, is projected to produce a nearly $4,000,000 profit for the rate year 2011–2012. Assuming we were to adopt the constitutional standards the United States Supreme Court has applied in the public utility ratemaking cases to the Superintendent's rating analysis in 24–A M.R.S. § 2736(2), Anthem's argument that the Superintendent misinterpreted the term "inadequate" would have no bearing on our decision:

> [I]t is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry … is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

*Duquesne Light Co. v. Barasch,* 488 U.S. 299, 310, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989) (alteration in original) (quoting *F.P.C. v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). Because Anthem suffers no losses, and indeed anticipates that it will earn a profit on the rates approved by the Superintendent, neither the rating nor the method

---

**13.** Based on Anthem's rate development submissions, the Superintendent found that from 2000 to 2010, Anthem's individual product line had generated a pre-tax profit of approximately 15.5 million dollars, or a 2.1% profit over the time it has provided individual health insurance products in Maine. There can be no dispute that over the period Anthem has offered its individual products to Maine consumers, the individual line has been self-sustaining and contributed to its company-wide surplus.

used in arriving at the approved rate results in an unconstitutional taking.

### III. CONCLUSION

[¶ 29] The Superintendent properly balanced the competing interests within the statutory framework of 24–A M.R.S. § 2736(2) in arriving at an approved rate increase of 5.2% for the second half of the 2011–2012 rate year. Although not required to do so pursuant to 24–A M.R.S. § 2736(2), the Superintendent did consider Anthem's request for a 3% built-in risk and profit margin and specifically incorporated a 1% built-in risk and profit margin into the final approved rate. Because the rate approved by the Superintendent provided a built-in risk and profit margin, Anthem's argument that the Superintendent approved a rate by improperly cross-subsidizing between Anthem's regulated and unregulated product lines, and the corollary argument that the approved rate resulted in a confiscatory taking in violation of the United States and Maine Constitutions, necessarily fail as a matter of law.

The entry is:

Judgment affirmed.