STATE OF MAINE
CUMBERLAND, ss.

BAY FERRIES, LTD., )
)
Plaintiff )
)
v. )
)
BOARD OF COMMISSIONERS FOR )
THE PORT OF PORTLAND )
)
and )
)
PORTLAND PILOTS, INC., )
)
Defendants. )

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-17-48

ORDER ON PLAINTIFF'S RULE 80B
APPEAL

STATE OF MAINE
Cumberland ss Clerk's Office

JUN 01 2018 1:55 PM

RECEIVED

Before the Court is Plaintiff Bay Ferries' Rule 80B appeal of Defendant Board of Commissioners for the Port of Portland's ("Board") November 28, 2017 approval of increased pilotage fees charged by Defendant Portland Pilots ("Pilots"). Oral argument was heard on this matter on May 7, 2017. For the following reasons, Plaintiff's appeal is granted.

I. Background

Bay Ferries operates a roundtrip ferry service between Yarmouth, Nova Scotia and Portland, Maine aboard a vessel named HSV Alakai, commonly referred to as "The CAT." The CAT operates seasonally five days a week. State law requires The CAT to take a licensed pilot each time it enters and departs from Portland Harbor. P. & S.L. 1981, ch. 98, § 5.2. Defendant Pilots are the only pilots operating in Portland Harbor. For its pilotage services, Bay Ferries must pay to Pilots a minimum pilotage fee, which is set by the Board. The Board is "a public body corporate and politic and is charged with responsibility for the regulation of navigation and commerce within Portland Harbor...." P. & S.L. 1981, ch. 98, §2. Pilotage fees are the product of the pilotage rate multiplied by the number of pilot units (a unit of measurement based on the size

and dimensions of the vessel being piloted). In 2016, the the Board set the pilotage rate at $7.09 per pilot unit, with each vessel subject to compulsory pilotage under the Portland Harbor Law required to pay for a minimum of 100 pilot units each time it took a pilot. (R. Tab 57 at 5.)

During the spring of 2017, at the request of the Pilots, the Board purported to raise the minimum pilotage fee from $709 to $1200. Bay Ferries appealed the Board's decision on procedural grounds, citing lack of notice and the Board's failure to follow proper ratemaking procedures. That appeal was consolidated with this proceeding, and decision on the validity of the spring 2017 rate increase is currently pending.

Presumably in response to Bay Ferries' objections to the initial ratemaking procedures, the Board instituted another ratemaking proceeding in the fall of 2017. On September 25, the Board announced it would hold a public hearing on October 12 during which it "may vote to propose a change in the authorized pilotage fee...." (R. Tab 3 at 0001.) On October 12, the Board, maintaining it was acting on its own initiative, proposed to set a minimum pilotage fee of $1200. Over the course of the next month leading up to the Board's final vote, the Board investigated pilotage rates at other New England ports. The Pilots provided to the Board evidence of the Pilots' operating expenses, but insisted that information about the Pilots' income was irrelevant to the proceedings, despite Bay Ferries' persistent assertion that evaluation of the Pilots' income was necessary to the determination of a just and reasonable rate. After taking evidence and hearing from Bay Ferries and Pilots on November 2 and November 16, the Board voted to set the new pilotage rate at $7.18 per pilot unit with a minimum of 150 pilot units, resulting in a minimum pilotage fee of $1077. The Board thereafter entered formal written findings and conclusions on November 28, 2017. Bay Ferries filed this appeal on December 20, 2017.

II. Standard of Review

The decision of a fact-finding and decision-making body in an 80B appeal is reviewed for errors of law, abuse of discretion, or findings not supported by substantial evidence. *Aydelott v. City of Portland*, 2010 ME 25, ¶ 10, 990 A.2d 1024. The party seeking to overturn the decision bears the burden of persuasion. *Id.* The court will "accord due consideration to the [agency's] interpretation and application of technical statutes and regulations and will overturn the [agency's] action only if the statute or regulation plainly compels a contrary result." *Dyer v. Superintendent of Ins.*, 2013 ME 61, ¶ 11, 69 A.3d 416 (quoting *Anthem Health Plans of Me., Inc. v. Superintendent of Ins.*, 2012 ME 21, ¶ 13, 40 A.3d 380). In reviewing factual findings, the court will "determine whether the [agency] made findings not supported by substantial evidence in the record [and] will examine the entire record to determine whether the agency could fairly and reasonably find the facts as it did, even if the record contains other inconsistent or contrary evidence." *Id.* (quotation marks and citations omitted).

III. Discussion

The Board's power to establish pilotage fees is derived from statute, which provides: "The commission may fix and establish by rule the compensation for the services of the pilots as may, from time to time, be deemed just and reasonable." P. & S.L. 1981, ch. 98, § 5.2. In opposing the new minimum fee, Bay Ferries' primary argument is that the Board could not have determined what constitutes a just and reasonable rate without reference to the Pilots' revenues, which the Pilots have refused to disclose. Bay Ferries expands on this argument by highlighting several fact findings made by the Board that expressly or impliedly find a decrease in revenues, a proposition which Bay Ferries argues has no support in the record. These findings include:

- [T]he number of vessels entering Portland Harbor has decreased substantially over the last 18 years, resulting in a reduction in the demand for pilotage services and in revenues earned by pilots;

- The reduction in vessels has made it more difficult for pilots to sustain their business and to provide reliable and safe pilotage services;
- Portland Pilots foresees significant financial challenges for pilots continuing to provide services in Portland Harbor given the reduced traffic if rates are not increased to a level that is comparable to other ports.

(R. Tab 57 at 6.) The Court agrees that the record does not contain substantial evidence supporting a loss of revenue to the Pilots warranting a 50% rate increase, and further finds that evidence of declining maritime traffic in Portland Harbor over the last 18 years and of rates charged by other regional ports is likewise insufficient to support the Board's conclusions.

To support its position that revenues must be considered in setting a just and reasonable rate, Bay Ferries cites to authority discussing ratemaking in the public utilities and milk industries. Defendants counter that ratemaking in these industries is irrelevant to setting pilotage rates and that the "just and reasonable" directives given to ratemaking bodies in these other industries are contained within more complex regulatory schemes, while the Portland Harbor Law offers no further guidance on the means by which the Board is to set just and reasonable compensation. Thus, argue Defendants, the Board, as the authority empowered to set rates, may decide which factors to consider in setting rates.

The Court agrees with Bay Ferries that "just and reasonable" is a term of art, the contours of which have been defined in case law both in the U.S. Supreme Court and in Maine courts. In the public utilities context, referring to the U.S. Supreme Court's analysis of "just and reasonable" ratemaking in *Federal Power Commission v. Hope Natural Gas Company*, 320 U.S. 591, 603 (1944), the Law Court laid out four factors that must be considered when setting utility rates:

> 1. what are the enterprise's gross utility revenues under the rate structure examined;
> 2. what are its operating expenses, including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues;
> 3. what utility property provides the service for which rates are charged and thus represents the base (rate base) on which a return should be earned; and

> 4. what percentage figure (rate of return) should be applied to the rate base in order to establish the return (wages of capital) to which investors in the utility enterprise are reasonably entitled.

*New England Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 390 A.2d 8, 14 (Me. 1978). This analysis begins with an examination of gross revenues and ends with an evaluation of a reasonable rate of return. The Maine Milk Commission is likewise subject to a "just and reasonable" standard when setting milk prices and must conduct an in-depth financial examination of the milk market in execution of its statutory duties. *See* 7 M.R.S.A. § 2954(2); *Cumberland Farms Northern, Inc. v. Maine Milk Comm'n*, 377 A.2d 84, 89-91 (Me. 1977).

Defendants correctly note that ratemaking in these industries is governed by complex statutory schemes, while the Board is mandated only to establish just and reasonable compensation without further statutory guidance as to how to carry out that directive. In their briefs, Defendants urge that pilotage fees are not analogous to prices for public utilities and milk because pilots provide a highly specialized service and are not simply a fungible product. At oral argument, the Board argued that pilotage fees are more analogous to legal fees, noting that courts do not ask attorneys to produce evidence of their income when deciding if an attorney's fees are reasonable. While this argument can be appreciated by members of the bar and bench alike, the fact remains that attorneys do not have a monopoly within their communities. In the city of Portland, as in virtually any locale in the U.S., attorney's rates are dictated by a free and open legal market, and the courts merely serve as a check to ensure individual attorneys are charging fees that are commensurate with the relevant market. As explained by Bay Ferries, the Pilots are a monopolistic enterprise, and the judgment of the Board is meant to serve as a stand-in for competition. When setting rates, the Board certainly may consider other factors such as the great skill demanded of pilots and the desirability of compensating them in a manner that acknowledges that skill.

Nonetheless, it is apparent that when the Legislature uses the term "just and reasonable" with regard to ratemaking, an evaluation of revenues lies at the core of the intended analysis.

In further support of its position, Bay Ferries called upon Dr. Robert Silkman as an economics expert to testify as to the factors the Board ought to consider in ratemaking. In short, Dr. Silkman explained that information about Pilots' revenues was necessary to reach a determination that the pilotage fee was not unreasonably high. Although Defendants called into question Dr. Silkman's credibility, expert testimony is not may not be necessary to explain a concept that can be understood through simple reasoning. The Board has a duty to determine that the pilotage rate is neither unreasonably low nor unreasonably high. *See Indus. Energy Consumer Grp. v. Public Utils. Comm'n*, 2001 ME 94, ¶ 16, 773 A.2d 1038; *New England Tel. & Tel. Co.*, 390 A.2d at 30. An unreasonably low rate is determined with reference to operating expenses, while a determination of what an unreasonably high rate would be necessitates an inquiry into how much income the Pilots stand to generate given a particular fee. Any intelligent exposition of a significant rate increase must by the rules of basic arithmetic include more than expenses, which are only half of the equation.

The court concludes that for the Board to properly discharge its duty of setting a just and reasonable "compensation for the services of the pilots" it must know the extent to which the Pilots are actually compensated for the particular work that they do. Based on information provided by the Pilots, the Board concluded "the number of vessels entering Portland Harbor has decreased substantially over the last 18 years, resulting in a reduction in the demand for pilotage services and in revenues earned by pilots." (R. 57 at 6.) The Board further recognized, "With the decrease in the number of larger vessels requiring pilot services, Portland Pilots has reduced the size of its operations from 5 full time employees in 2000 to 2 full time employees in 2017. It has also reduced

its overhead by eliminating office space." (R. 57 at 6.) There has been no assertion that the Pilots require more full-time employees to handle the number of vessels calling on the port; rather, trimming the staff is an expected response to lower demand for pilotage services. Nor has any party provided evidence that the two pilots currently operating in Portland are not reasonably compensated. Defendants pressed the argument that rates in Portland should match rates in other regional ports in order to stay competitive and attract highly qualified pilots to Portland; however, this argument is unsupported by evidence, as there is no information in the record regarding the income of pilots in Portland or the income of pilots in other regional ports. This tautological conclusion begs the question rather than answers it.

In an October 10, 2017 letter from the Pilots' attorney to the Board's attorney, the Pilots' attorney refers to "the need for a minimum fee that actually covers the Pilots' minimum expenses. (In truth, the minimum fee of $1,200 per trip is somewhat less than the minimum expense ($1,300 per day) to run, crew, and insure a pilot vessel.)." (R. Tab 6 at 0026.) In an October 19, 2017 letter from the Board's Chair to the Pilots' Captain Mark Klopp, the Chair quotes this language in requesting evidence of the Pilots' minimum expenses. (R. Tab 14.) This point was reiterated at oral argument. To the extent this statement by the Pilots' attorney was intended to imply that a minimum fee of $1200 would be insufficient to cover Pilots' minimum expenses, it is misleading. Presumably more than one vessel per day is piloted in Portland Harbor, and many vessels pay far more than the minimum fee due to their size. The Pilots do not explain why it is reasonable to expect the pilotage of a single vessel paying the minimum fee to cover an entire day's worth of expenses.

The Board maintains that the Pilots should not be singled out to produce evidence of their income because the fee applies to any pilots operating in Portland Harbor, not just Portland Pilots,

and because the increase was proposed by the Board, not by the Pilots. The Court is not persuaded by either of these arguments. Although it is true that the fee would theoretically apply to any pilots operating in Portland Harbor, it is undisputed that Portland Pilots are currently the only pilots doing so, and there is no evidence indicating that this has not been the case for many years. Furthermore, although the Board insists the fee increase was done on the Board's own initiative, the Court cannot ignore the fact that the fee originally proposed by the Board was identical to the fee proposed by the Pilots in March 2017. This Court has already found the spring proceedings and the fall proceedings to be so closely related that they should be – and have been – consolidated into one case. It is clear that the Pilots' attorney did not misspeak when he stated at the November 2 hearing: "Again the purpose of this hearing is to reaffirm the rates that the pilots requested back in March of 2017." (R. 55 at 19:23-24.) To that end, the Board's assertion that "[i]f ... an application is submitted by the Portland Pilots ... requesting an increase, [f]inancial records, including revenue, may well be needed in that instance" (R. 57 at 9 fn. 5) provides all the more reason for this Court to remand this matter to the Board for consideration of the Pilots' income.

There is an abundance of information in the record regarding pilotage rates at other New England ports. (*See* R. Tab 5.) Defendants take the position that the new fee approved by the Board is reasonable because it puts fees in Portland more in line with pilotage fees in other regional ports. While not entirely irrelevant, fees charged by other ports are not, standing alone, conclusive as to whether the fee in Portland is just and reasonable. The record contains minimal information regarding how fees in other ports were set. Did these other ratemaking bodies consider expenses incurred by pilots in these ports? Did they consider income generated by pilotage operations? Did they consider the number and size of vessels calling on their respective ports? The number of pilots and other staff receiving compensation? The number of vessels maintained by the pilots? The time

it takes to pilot a vessel into and out of the harbor? There is simply no basis on which to conclude that the cost of pilotage services in Boston Harbor, for example, should be equivalent to the cost of pilotage services in Portland Harbor. Tellingly, while all pilotage rates in Maine except rates in Portland are set by the Maine Pilotage Commission ("MPC"), data in the record from eleven Maine ports indicates that rates charged in Maine ports are variable in terms of the base pilotage fee, the minimum number of pilot units, and the types of additional fees assessed. (R. Tab 5 at 0011-0015.) Although the record contains minimal information regarding how the MPC arrived at the rates for each port, it is clear that the question investigated by the MPC when setting rates is more searching than "What do other regional ports charge?"

In fact, examining data from other ports tends to suggest that the Board's approval of a 50% increase of the minimum pilotage fee was out of step with ratemaking processes in other ports. There is ample evidence to support the conclusion that when regional ports increase pilotage fees, it is done in modest incremental fashion, typically increasing fees by no more than 25%, often over a period of years. (*See, e.g.*, R. Tab 5 at 0012 (increasing minimum fee by 23% over 4 years); R. Tab 5 at 0014 (increasing rate by 18% over 4 years); R. Tab 5 at 0015 (same).) A 50% increase in the minimum fee implemented in a single year strikes the Court as questionable at best, particularly without the benefit of a record that includes an analysis of revenues.

Indeed, considering the most recent rate increase requested by Pilots and approved by the Board occurred in 2016, one would almost have to conclude that if the new fee were just and reasonable, the 2016 fee that was 50% lower was not just and reasonable. However, unlike the ratemaking proceedings currently under review, the 2016 ratemaking proceedings were uncontested. For this reason, the Court finds a lookback of 18 years is arbitrary, and evidence of harbor traffic prior to 2016 is largely irrelevant. The record is bereft of evidence indicating what

conditions have changed since 2016 that necessitate such a dramatic rate increase. While the Pilots are correct that the Board is entitled to a presumption of regularity, *see Conservation Law Found. v. Dep't of Envtl. Prot.*, 2003 ME 62, ¶ 32, 823 A.2d 551, it is clear from examining ratemaking proceedings in other ports that a 50% rate increase implemented over the course of a single year is highly irregular.

The Court does not decide today whether or not the minimum fee set by the Board is just and reasonable. Certainly, if Bay Ferries is correct that the fees to be paid by The CAT and Eimskip alone would cover nearly all of the Pilots' operating expenses, the fee is probably unreasonable. (Pl.'s Brief at 8-9.) As discussed above, the steep and immediate rise in the fee is also a red flag. On the other hand, a fee increase may be warranted if indeed revenues have dropped to unsustainable lows due to decreased vessel traffic in Portland Harbor. There was some evidence presented to the Board that the Pilots' vessels are in need of repairs; nonetheless, this fact alone is not sufficient to justify a 50% rate increase. The fact remains that given the current record, neither the Court nor the Board has sufficient information to draw a conclusion as to the reasonableness of the new fee. The Court only concludes that the Board's decision was not based on substantial evidence supporting the determination of a just and reasonable fee. The only means by which the Board can confidently determine a just and reasonable fee is to examine, among other things, the costs of providing pilotage services in Portland Harbor in relation to how much income pilots stand to generate given a particular fee scheme and the number and types of vessels calling upon this port.

IV. Conclusion

For the foregoing reasons, Plaintiff's Rule 80B appeal is GRANTED. The November 28, 2017 decision of the Board of Harbor Commissioners for the Port of Portland is VACATED, and

this matter is REMANDED for further proceedings consistent with this opinion. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: _____6/1/18_____

_____
Lance E. Walker, Justice
Maine Superior Court

**Entered on the Docket:** 06/01/18

MCV